HERB'S WELDING, INC., ET AL. *v.* GRAY ET AL.

No. 83–728.   Argued October 3, 1984—Decided March 18, 1985

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and O'CONNOR, JJ., joined, *post*, p. 428.

*Wood Brown III* argued the cause and filed a brief for petitioners.

*Carolyn F. Corwin* argued the cause for the federal respondent. With her on the brief were *Solicitor General Lee, Deputy Solicitor General Geller, Karen I. Ward, Allen H. Feldman,* and *Joshua T. Gillelan II. T. Gerald Henderson* argued the cause for respondent Gray. With him on the brief was *David W. Robertson.**

JUSTICE WHITE delivered the opinion of the Court.

The Longshoremen's and Harbor Workers' Compensation Act (LHWCA or Act), 44 Stat. 1424, as amended, 33 U. S. C. § 901 *et seq.*, provides compensation for the death or disability of any person engaged in "maritime employment," § 902(3), if the disability or death results from an injury incurred upon the navigable waters of the United States or any adjoining pier or other area customarily used by an employer in loading, unloading, repairing, or building a vessel, § 903(a).[1] Thus, a worker claiming under the Act must sat-

---

*Briefs of *amici curiae* urging reversal were filed for the Kerr-McGee Corp. by *Christopher Tompkins* and *René H. Himel, Jr.;* and for Texaco, Inc., et al. by *Robert M. Contois, Jr.*

[1] Section 2(3) of the Act, 86 Stat. 1251, 33 U. S. C. § 902(3), provides: "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew

isfy both a "status" and a "situs" test. The court below held that respondent Robert Gray, a welder working on a fixed offshore oil-drilling platform in state territorial waters, was entitled to benefits under the Act. We reverse for the reason that Gray was not engaged in maritime employment.

I

Respondent Gray worked for Herb's Welding, Inc., in the Bay Marchand oil and gas field off the Louisiana coast. Herb's Welding provided welding services to the owners of drilling platforms. The field was located partly in Louisiana territorial waters, i. e., within three miles of the shore, and partly on the Outer Continental Shelf. Gray ate and slept on a platform situated in Louisiana waters. He spent roughly three-quarters of his working time on platforms in state waters and the rest on platforms on the Outer Continental Shelf. He worked exclusively as a welder, building and replacing pipelines and doing general maintenance work on the platforms.

On July 11, 1975, Gray was welding a gas flow line on a fixed platform[2] located in Louisiana waters. He burnt

of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."

Section 3(a) of the Act, 33 U. S. C. § 903(a), provides in part:

"Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."

[2] Offshore oil rigs are of two general sorts: fixed and floating. Hearings on S. 2318 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., 395–396, 480–486 (1972) (hereinafter Hearings). Floating structures have been treated as vessels by the lower courts. E. g., Producers Drilling Co. v. Gray, 361 F. 2d 432, 437 (CA5 1966). Workers on them, unlike workers on fixed platforms, see Rodrigue v. Aetna Casualty & Surety Co., 395 U. S. 352 (1969), enjoy the same remedies as workers on ships. If permanently

through the bottom of the line and an explosion occurred. Gray ran from the area, and in doing so hurt his knee. He sought benefits under the LHWCA for lost wages, disability, and medical expenses.[3] When petitioner United States Fidelity & Guaranty Co., the workers' compensation carrier for Herb's Welding, denied LHWCA benefits, Gray filed a complaint with the Department of Labor. The Administrative Law Judge (ALJ), relying on our decision in *Rodrigue* v. *Aetna Casualty & Surety Co.*, 395 U. S. 352 (1969), ruled that because Gray's work was totally involved in the exploration for, and development and transmission of, oil and gas from submerged lands, it was not relevant to traditional maritime law and lacked any significant maritime connection. Gray therefore did not satisfy the LHWCA's status requirement.

The Benefits Review Board reversed on other grounds. 12 BRBS 752 (1980). By a vote of 2–1, it concluded that irrespective of the nature of his employment, Gray could recover by virtue of a provision of the Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U. S. C. § 1331 *et seq.* (Lands Act), that

attached to the vessel as crewmembers, they are regarded as seamen; if not, they are covered by the LHWCA because they are employed on navigable waters. See generally Robertson, Injuries to Marine Petroleum Workers: A Plea for Radical Simplification, 55 Texas L. Rev. 973, 982–992 (1977) (hereinafter Robertson). Gray is not in a position to take advantage of this line of cases. All, or almost all, the platforms in the field were fixed production platforms rather than floating rigs. Tr. of Oral Arg. in No. 77–LHCA–1308, before Benefits Review Board, p. 12. There has never been any dispute that Gray was injured on a fixed platform, nor any contention that he should be considered to have been on a vessel at the time of his injury. The only question, therefore, is whether Gray is limited to state workers' compensation remedies or may also recover under the LHWCA.

[3] Gray did recover under the Louisiana workers' compensation scheme, receiving weekly benefits totalling $3,172.50 over two years as well as $1,696.14 for medical expenses. These payments were credited against his later LHWCA recovery. See App. to Pet. for Cert. A–45. State workers' compensation and the LHWCA are not mutually exclusive remedies. *Sun Ship, Inc.* v. *Pennsylvania*, 447 U. S. 715 (1980).

grants LHWCA benefits to offshore oil workers injured on the Outer Continental Shelf.[4]   Although Gray had been injured in state waters, the Board felt that his injury nonetheless could be said to have occurred, in the words of the statute, "as a result of" operations on the outer shelf.   It considered his work "integrally related" to such operations. 12 BRBS, at 757.   The dissenting Board member argued that the Lands Act provides LHWCA benefits only for injuries actually occurring in the geographic area of the outer shelf.   *Id.*, at 761–763.

The Board reaffirmed its position after the case was remanded to the ALJ for entry of judgment and calculation of benefits, and petitioners sought review in the Court of Appeals for the Fifth Circuit.   That court affirmed, relying directly on the LHWCA rather than on the Lands Act. 703 F. 2d 176 (1983).   With regard to the Act's situs requirement, it noted that this Court had compared drilling platforms to wharves in *Rodrigue* v. *Aetna Casualty & Surety Co., supra.*   Given that the 1972 Amendments to the LHWCA extended coverage to accidents occurring on wharves, it would be incongruous if they did not also reach accidents occurring on drilling platforms.   Also, since workers injured on movable barges, on fixed platforms on the Outer Continental Shelf, or en route to fixed platforms, are all covered, there would be a "curious hole" in coverage if someone in Gray's position was not.   703 F. 2d, at 177–178. As for Gray's status, the Court of Appeals, differing with the ALJ, held that Gray's work bore "a realistically significant

---

[4] The relevant section provides:

"With respect to disability or death of an employee resulting from any injury occurring as the result of operations conducted on the Outer Continental Shelf for the purpose of exploring for, developing, removing or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the outer Continental Shelf, compensation shall be payable under the provisions of the Longshoremen's and Harbor Workers' Compensation Act."   67 Stat. 463, as amended, 43 U. S. C. § 1333(b).

relationship to traditional maritime activity involving navigation and commerce on navigable waters," *id.*, at 179–180, because it was an integral part of the offshore drilling process, which, the court had held in *Pippen* v. *Shell Oil Co.*, 661 F. 2d 378 (1981), was itself maritime commerce. We granted certiorari. 465 U. S. 1098 (1984).

## II

## A

When extractive operations first moved offshore, all claims for injuries on fixed platforms proceeded under state workers' compensation schemes. See Hearings, at 396, 409, 411. See also Robertson 993. With the 1953 passage of the Lands Act, Congress extended LHWCA coverage to oil workers more than three miles offshore. 43 U. S. C. § 1333(b). Because until 1972 the LHWCA itself extended coverage only to accidents occurring on navigable waters, 33 U. S. C. § 903 (1970 ed.), and because stationary rigs were considered to be islands, *Rodrigue* v. *Aetna Casualty & Surety Co.*, *supra*, oil rig workers inside the 3-mile limit were left to recover under state schemes. See, *e. g.*, *Freeman* v. *Chevron Oil Co.*, 517 F. 2d 201 (CA5 1975); *Gifford* v. *Aurand Mfg. Co.*, 207 So. 2d 160 (La. App. 1968). Any worker, inside or outside the 3-mile limit, who qualified as a seaman was not covered by the LHWCA, but could sue under the Jones Act, 46 U. S. C. § 688, the Death on the High Seas Act, 46 U. S. C. § 761 *et seq.*, and the general maritime law. Hearings, at 411–414, 450–459, 487; see n. 1, *supra.* See also Wright, Jurisdiction in the Tidelands, 32 Tulane L. Rev. 175, 186 (1958).

So matters stood when Congress amended the LHWCA in 1972. What is known about the congressional intent behind that legislation has been amply described in our prior opinions. See, *e. g.*, *Director, OWCP* v. *Perini North River Associates*, 459 U. S. 297 (1983); *Sun Ship, Inc.* v. *Pennsylvania*, 447 U. S. 715, 717–722 (1980); *Northeast Marine*

*Terminal Co.* v. *Caputo*, 432 U. S. 249, 256–265 (1977). The most important of Congress' concerns, for present purposes, was the desire to extend coverage to longshoremen, harborworkers, and others who were injured while on piers, docks, and other areas customarily used to load and unload ships or to repair or build ships, rather than while actually afloat. Whereas prior to 1972 the Act reached only accidents occurring on navigable waters, the amended 33 U. S. C. § 903 expressly extended coverage to "adjoining area[s]." At the same time, the amended definition of an "employee" limited coverage to employees engaged in "maritime employment."

The Act, as amended, does not mention offshore drilling rigs or the workers thereon. The legislative history of the amendments is also silent, although early in the legislative process, a bill was introduced to extend the Act to all offshore oil workers. The bill died in Committee. While hardly dispositive, it is worth noting that the same Committee considered the 1972 Amendments to the LHWCA, and the possible extension of the Lands Act's application of the LHWCA to drilling platforms, apparently without it ever occurring to anyone that the two might have been duplicative. The concurrent but independent reconsideration of both the Lands Act and the LHWCA, the congressional view that the amendments to the latter involved the "[e]xtension of [c]overage to [s]horeside [a]reas," H. R. Rep. No 92–1441, p. 10 (1972), and the absence of any mention of drilling platforms in the discussion of the LHWCA, combine to suggest that the 1972 Congress at least did not intentionally extend the LHWCA to workers such as Gray.[5]

---

[5] Petitioners view Congress' failure to extend LHWCA coverage to all offshore oil workers as an explicit rejection of the position adopted by the court below. However, it appears that the bill, S. 1547, was designed not so much to increase the benefits of those not covered, as to limit the remedies of those workers who could qualify as seamen and so were not confined to the workers' compensation scheme. See 117 Cong. Rec. 10490–10491

## B

The rationale of the Court of Appeals was that offshore drilling is maritime commerce and that anyone performing any task that is part and parcel of that activity is in maritime employment for LHWCA purposes. Since it is doubtful that an offshore driller will pay and maintain a worker on an offshore rig whose job is unnecessary to the venture, this approach would extend coverage to virtually everyone on the stationary platform. We think this construction of the Act is untenable.

The Act does not define the term "maritime employment," but our cases and the legislative history of the amendments foreclose the Court of Appeals' reading. *Rodrigue* involved two men killed while working on an offshore drilling rig on the Outer Continental Shelf. Their families brought third-party negligence suits in federal court, claiming recovery under both the Death on the High Seas Act and the state law of Louisiana. The District Court ruled that resort could not be had to state law and that the High Seas Act provided the exclusive remedy. The Court of Appeals for the Fifth Circuit affirmed, holding that the men had been engaged in maritime activity on the high seas and that maritime law was the exclusive source of relief. We reversed. First, the platforms involved were artificial islands and were to be treated as though they were federal enclaves in an upland State. Federal law was to govern accidents occurring on these islands; but, contrary to the Court of Appeals, we held that the Lands Act and borrowed state law, not the maritime law, constituted the controlling federal law. The platforms "were islands, albeit artificial ones, and the accidents had no more connection with the ordinary stuff of admiralty than do

(1971) (statement of Sen. Tower); Hearings, at 396–403, 418–419, 602. The bill was opposed because it would limit recoveries by those who did better without LHWCA coverage. *Id.*, at 589–590, 602. See generally *Boudreaux* v. *American Workover, Inc.*, 680 F. 2d 1034, 1053 (CA5 1982).

accidents on piers."[6]  395 U. S., at 360.   Indeed, observing that the Court had previously "held that drilling platforms are not within admiralty jurisdiction," we indicated that drilling platforms were not even suggestive of traditional maritime affairs.   *Id.*, at 360–361.

We also went on to examine the legislative history of the Lands Act and noted (1) that Congress was of the view that maritime law would not apply to fixed platforms unless a statute expressly so provided; and (2) that Congress had seriously considered applying maritime law to these platforms but had rejected that approach because it considered maritime law to be inapposite, a view that would be untenable if drilling from a fixed platform is a maritime operation.   The history of the Lands Act at the very least forecloses the Court of Appeals' holding that offshore drilling is a maritime activity and that any task essential thereto is maritime employment for LHWCA purposes.[7]

We cannot assume that Congress was unfamiliar with *Rodrigue* and the Lands Act when it referred to "maritime employment" in defining the term "employee" in 1972.[8]   It

---

[6] The dissent finds "substantial irony" in this analogy in light of the 1972 LHWCA Amendments, which extended coverage landward to piers. *Post*, at 433–434.   The irony dissipates in light of the fact that while *Rodrigue* did observe that offshore platforms are *like* piers, its holding was that they *are* islands.   395 U. S., at 360.   It has not been suggested that workers on islands are covered by the amended LHWCA.

[7] The dissent considers the Lands Act's extension of the LHWCA to platforms on the Outer Continental Shelf an indication that work thereon is maritime employment.   *Post*, at 437–438.   However, as the dissent acknowledges, the LHWCA has been extended to several emphatically nonmaritime locales.   Undeterred, the dissent points out that Congress left regulation of offshore platforms to the Coast Guard.   Yet one would not have expected otherwise, since geographically the platforms fall within the Coast Guard's jurisdiction.   No one contends that offshore platforms are not offshore.

[8] We note also that the LHWCA covered an employee injured on navigable waters if his employer had at least one employee engaged in "maritime employment."   In contrast, in providing for LHWCA coverage of

would have been a significant departure from prior understanding to use that phrase to reach stationary drilling rigs generally.

The Fifth Circuit's expansive view of maritime employment is also inconsistent with our prior cases under the 1972 Amendments to the LHWCA. The expansion of the definition of navigable waters to include rather large shoreside areas necessitated an affirmative description of the particular employees working in those areas who would be covered. This was the function of the maritime employment requirement. But Congress did not seek to cover all those who breathe salt air. Its purpose was to cover those workers on the situs who are involved in the essential elements of loading and unloading; it is "clear that persons who are on the situs but not engaged in the overall process of loading or unloading vessels are not covered." *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S., at 267. While "maritime employment" is not limited to the occupations specifically mentioned in § 2(3),[9] neither can it be read to eliminate any requirement

employees working in offshore oil fields, the Lands Act defined the term "employer" as "an employer any of whose employees are employed in such operations," *i. e.*, "exploring for, developing, removing, or transporting by pipeline the natural resources . . . of the subsoil and seabed of the outer Continental Shelf . . . ." 43 U. S. C. § 1333(b).

[9] The LHWCA covers "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker." By the use of the term "including," Congress indicated that the specifically mentioned occupations are not exclusive. See *P. C. Pfeiffer Co.* v. *Ford*, 444 U. S. 69, 77–78, n. 7 (1979); H. R. Rep. No. 92–1441, p. 11 (1972).

There have been occasional legislative efforts to limit the definition of "maritime employment" to enumerated tasks. For example, in 1980 Representative Erlenborn proposed deleting the "maritime employment" language and limiting coverage to "a longshoreman, ship repairman, ship builder, ship breaker, or harbor worker" who "was directly engaged in activities relating to such employment" when injured. H. R. 7610, 96th Cong., 2d Sess., § 2(a) (1980). His bill specifically excluded "any person

of a connection with the loading or construction of ships. As we have said, the "maritime employment" requirement is "an occupational test that focuses on loading and unloading." *P. C. Pfeiffer Co.* v. *Ford*, 444 U. S. 69, 80 (1979). The Amendments were not meant "to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity." H. R. Rep. No. 92–1441, p. 11 (1972); S. Rep. No. 92–1125, p. 13 (1972). We have never read "maritime employment" to extend so far beyond those actually involved in moving cargo between ship and land transportation. Both *Caputo* and *P. C. Pfeiffer Co.* make this clear and lead us to the conclusion that Gray was not engaged in maritime employment for purposes of the LHWCA.[10]

---

who, at the time of injury, was engaged in administration, clerical, custodial, delivery, maintenance, or repair of gear or equipment . . . or any other employments not direct and integral parts of vessel loading, unloading, repairing, building, or breaking." *Ibid.* The bill was referred to Committee, 126 Cong. Rec. 15417 (1980), and was never reported by the Committee.

[10] This view of "maritime employment" does not preclude benefits for those whose injury would have been covered before 1972 because it occurred "on navigable waters." *Director, OWCP* v. *Perini North River Associates*, 459 U. S. 297 (1983). No claim is made that Gray was injured "on navigable waters." Indeed, it was agreed by all counsel at oral argument that prior to 1972 Gray would not have been covered, except arguably by operation of the Lands Act. See Tr. of Oral Arg. 11, 46, 52–54. See also 703 F. 2d, at 179.

In light of the dissent's reliance on *Perini, post,* at 442–443, we point out that that decision was carefully limited to coverage of an employee "injured while performing his job upon actual navigable waters." 459 U. S., at 299; see *id.,* at 305, 311–312, 315, 324. The Court's rationale was that, first, any employee injured on navigable waters would have been covered prior to 1972, and, second, Congress did not intend to restrict coverage in adopting its "maritime employment" test. The holding was, "of course," limited to workers covered prior to 1972, *id.,* at 324, n. 34, a group to which Gray does not belong. The opinion says nothing about the contours of the status requirement as applied to a worker, like Gray, who was not injured on

Gray was a welder. His work had nothing to do with the loading or unloading process, nor is there any indication that he was even employed in the maintenance of equipment used in such tasks. Gray's welding work was far removed from traditional LHWCA activities, notwithstanding the fact that he unloaded his own gear upon arriving at a platform by boat. Tr. of Oral Arg. 56. He built and maintained pipelines and the platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment,[11] particularly since exploration and development of the Continental Shelf are not themselves maritime commerce.

The dissent emphasizes that Gray was generally on or near the water and faced maritime hazards. *Post,* at 445–449. To the extent this is so, it is relevant to "situs," not "status." To hold that Gray was necessarily engaged in maritime employment because he was on a drilling platform would ignore Congress' admonition that not everyone on a covered situs automatically satisfies the status test. See S. Rep. No. 92–1125, p. 13 (1972). The dissent considers "[t]he maritime nature of the occupation . . . apparent from examining

---

navigable waters. To hold that enactment of the status requirement did not constrict prior coverage is wholly different from refusing to view that requirement as a meaningful limit on the Act's extended coverage.

[11] The general counsel to the International Association of Drilling Contractors stated to the Senate Subcommittee in 1972:

"Irrespective of design, bottom resting, semi-submersible, or full floating, these structures [drilling platforms] perform only as a base from which the drilling industry conducts its operations. The operations, once the structure is in place, are no different from that which takes place on dry land. All of the equipment and methods utilized in the drilling operations are identical to our land based operations. The exposure to employee injuries are the same. Accident frequency rates and severity of injury are no greater, in fact less, because of crew selection and confinement to an area permits concentrated training and safety programs." Hearings, at 410–411.

its location in terms of the expanded situs coverage of the 1972 Amendments." *Post*, at 446. We recognize that the nature of a particular job is defined in part by its location. But to classify Gray's employment as maritime because he was on a covered situs, *post*, at 448, or in a "maritime environment," *post*, at 450, would blur together requirements Congress intended to be distinct. We cannot thus read the status requirement out of the statute.[12]

### III

Respondents, and the dissenters, object that denying coverage to someone in Gray's position will result in exactly the sort of inconsistent, checkered coverage that Congress sought to eliminate in 1972. In the words of the court below, it creates a "curious hole" in coverage, 703 F. 2d, at 178, because Gray would have been covered had he been injured on navigable waters or on the outer shelf.

We do not find the argument compelling. First, this submission goes far beyond Congress' undoubted desire to treat equally all workers engaged in loading or unloading a ship, whether they were injured on the ship or on an adjoining pier or dock. The former were covered prior to 1972; the latter were not. Both are covered under the 1972 Amendments. Second, there will always be a boundary to coverage, and there will always be people who cross it during their employment. *Nacirema Operating Co.* v. *Johnson*, 396 U. S. 212, 223–224 (1969). If that phenomenon was enough to require coverage, the Act would have to reach much further than

---

[12] Throughout these proceedings, Gray has argued that he need not satisfy the status/situs test because he falls within the Lands Act's incorporation of LHWCA benefits. See 43 U. S. C. § 1333(b). The Benefits Review Board so held. He repeats that argument in this Court, as he is free to do. *United States* v. *New York Telephone Co.*, 434 U. S. 159, 166, n. 8 (1977). However, it has not been fully briefed and argued here and was not discussed by the Court of Appeals. We therefore decline to consider it. See *Dandridge* v. *Williams*, 397 U. S. 471, 475–476, n. 6 (1970). It is open to the Court of Appeals on remand.

anyone argues that it does or should. Third, the inconsistent coverage here results primarily from the explicit geographic limitation to the Lands Act's incorporation of the LHWCA. Gray would indeed have been covered for a significant portion of his work-time, but because of the Lands Act, not because he fell within the terms of the LHWCA.[18] Congress' desire to make LHWCA coverage uniform reveals little about the position of those for whom partial coverage results from a separate statute. This is especially true because that statute draws a clear geographical boundary that will predictably result in workers moving in and out of coverage.

As we have said before in this area, if Congress' coverage decisions are mistaken as a matter of policy, it is for Congress to change them. We should not legislate for them. See *Victory Carriers, Inc.* v. *Law*, 404 U. S. 202, 216 (1971).

## IV

Because Gray's employment was not "maritime," he does not qualify for benefits under the LHWCA. We need not determine whether he satisfied the Act's situs requirement. We express no opinion on his argument that he is covered by 43 U. S. C. § 1333(b). The judgment is reversed, and the

---

[18] Gray traveled between platforms by boat and might have been covered, before or after 1972, had he been injured while in transit. See *Director, OWCP* v. *Perini North River Associates*, 459 U. S., at 324. But see *id.*, at 324, n. 34 ("We express no opinion whether such coverage extends to a worker injured while transiently or fortuitously upon actual navigable waters"). Even if he would have been covered for some small fraction of his time independent of the Lands Act, however, he is a far cry from the paradigmatic longshoreman who walked in and out of coverage during his workday and spent substantial amounts of his time "on navigable waters." Any coverage attributable to the LHWCA itself was *de minimis*. We also note in passing a substantial difference between a worker performing a set of tasks requiring him to be both on and off navigable waters, and a worker whose job is entirely land-based but who takes a boat to work.

case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE O'CONNOR join, dissenting.

Today the Court holds that a marine petroleum worker is not covered by the Longshoremen's and Harbor Workers' Compensation Act (LHWCA or Act), 44 Stat. 1424, as amended, 33 U. S. C. § 901 *et seq.*, when pursuing his occupation on a fixed offshore rig within the 3-mile limit of a State's territorial waters. Although such an individual routinely travels over water as an essential part of his job and performs the rest of his job adjacent to and surrounded by water, he is not covered because, in the Court's view, his occupation is not "maritime employment." See § 2(3), 33 U. S. C. § 902(3). The Court reaches this conclusion even though a worker of the same occupation, working in the same industry, and performing the same tasks on a rig located in the same place, would be covered if that rig were one that was capable of floating.[1] Neither the Court nor any of the parties have identified any reason why Congress might have

---

[1] "Floating" petroleum rigs are classified as vessels in admiralty jurisprudence, see *Producers Drilling Co.* v. *Gray*, 361 F. 2d 432, 437 (CA5 1966), and as such have long been within the Act's coverage. *Ante*, at 416–417, n. 2. It must be emphasized, however, that in admiralty law, the classification of a structure as "floating" turns only on its capacity to float, and not on the relevance of buoyancy to its typical use or its state at the time of an injury. Many "floating" offshore petroleum rigs are so classified because they are floated to their drilling sites; but once there, they are elevated above the water and supported by legs that rest on the ocean bottom. See *Producers Drilling Co., supra*, at 437 (classification includes "'almost any structure that once floated or is capable of floating on navigable waters . . .' and . . . includes 'special purpose structures not usually employed as a means of transport by water but designed to float on water'") (quoting *Offshore Co.* v. *Robison*, 266 F. 2d 769, 771 (CA5 1959). See also n. 14, *infra*.

desired this distinction. To the contrary, a principal congressional goal behind the 1972 Amendments was to rid the Act of just such arbitrary distinctions derived from traditional admiralty jurisprudence. Because the coverage pattern that the Court adopts is at odds with the Act's 1972 Amendments, and because the accident here meets the Amendments' status and situs tests, I respectfully dissent.

## I

At the outset, it is useful to examine the LHWCA's general coverage pattern, and, in particular, the purposes of its 1972 Amendments. Before 1972, LHWCA coverage was determined largely by the traditional "locality" test of maritime tort jurisdiction. Under that test, if an accident occurred on the navigable waters (which usually meant on a vessel) the worker was covered, no matter how close the accident may have been to the adjoining land or pier; in contrast, if an accident occurred on adjoining land, a pier, or a wharf there was only state coverage, no matter how close the accident may have been to the water's edge. See *Nacirema Operating Co.* v. *Johnson*, 396 U. S. 212 (1969). Cf. *Victory Carriers* v. *Law*, 404 U. S. 202 (1971). A longshoreman moving cargo from ship to pier was thus covered for injuries incurred on board the ship, but not for any injuries incurred after stepping onto the pier. *Nacirema Operating Co., supra.* See also *P. C. Pfeiffer Co.* v. *Ford*, 444 U. S. 69, 72 (1979) ("A single situs requirement . . . governed the scope of [the Act's] coverage").

Behind this system of "checkered coverage" stood the reality that federal and state workers' compensation schemes usually had very different benefit levels, the state benefit levels often being inadequate. See n. 2, *infra.* Thus, those workers whose professional lives might require that they move back and forth between water and adjoining land— "amphibious workers"—and whose protection was the principal goal of the LHWCA, had to rely for workers' compensation on an imperfect amalgam of federal and state workers'

compensation laws. As critics noted, the system's adequacy in any given case was a function of the pure fortuity of a work-related accident's exact location.[2]

In 1972, Congress amended the Act, expanding coverage landward as a means of rationalizing the coverage pattern. This case involves two of the principal Amendments. First, Congress expanded the situs of coverage to include those areas immediately adjacent to the water, in which maritime workers would be likely to spend a large part of their working lives. The Act would now cover "disability or death result[ing] from an injury occurring upon the navigable waters of the United States *(including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)* . . . ." § 3(a), 33 U. S. C. § 903(a) (emphasis added). Congress thus broke with the tradition of applying the strict locality test of admiralty tort jurisdiction to limit LHWCA's coverage.

But if only the situs of coverage had been altered, a new problem would have been created. Expanding the situs landward would not only have brought uniform coverage to those occupations previously covered in part, it would also have brought within the covered situs large numbers of occupations whose members had never before been covered at all. Workers such as truckdrivers or clericals, though present

---

[2] As both the Senate and House Reports that accompanied the 1972 Amendments stated:

"[C]overage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs.

"To make matters worse, most State Workmen's Compensation laws provide benefits which are inadequate . . . ." S. Rep. No. 92–1125, pp. 12–13 (1972) (hereinafter cited as S. Rep.); H. R. Rep. No. 92–1441, pp. 10–11 (1972) (containing identical language) (hereinafter cited as H. R. Rep.).

on a pier at certain times as part of their employment, are engaging in purely land-bound, rather than amphibious, occupations. See *Northeast Marine Terminal Co. v. Caputo*, 432 U. S. 249, 267 (1977); S. Rep. 13; H. R. Rep. 10–11. To expand coverage to these workers, whose work lives take them back and forth between newly covered "adjoining area[s]" and uncovered inland locations, would create a serious demarcation line problem, and would also obviously recreate, and even enlarge, the problem of "checkered coverage" based on the fortuity of the exact location of a particular injury. Thus, Congress adopted a "status" test for coverage to exclude members of these land-bound occupations. "The 1972 Amendments thus changed what had been essentially only a 'situs' test of eligibility for compensation to one looking to both the 'situs' of the injury and the 'status' of the injured." See *Caputo, supra,* at 264–265.

Under the "status" test, coverage was limited to those "engaged in maritime employment." § 2(3), 33 U. S. C. § 902(3):

> "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker . . . ."[3]

Both changes together were part of an effort to rationalize the Act's coverage pattern. Congress wanted a system that did not depend on the "fortuitous circumstance of whether the injury occurred on land or over water," S. Rep. 13; H. R. Rep. 10–11, and it wanted a "uniform compensation system to apply to employees who would otherwise be covered . . .

---

[3] The term employee is further limited by the exclusion of "[m]aster[s] or member[s] of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." § 2(3), 33 U. S. C. § 902(3). The exclusion corresponds to "seamen" who enjoy Jones Act coverage. See 46 U. S. C. § 688. This exception is irrelevant to this case.

for part of their activity." *Ibid.* Analyzing this case in terms of Congress' stated goals and in terms of this Court's prior efforts to give meaning to the 1972 Amendments makes clear that the Act applies to marine petroleum workers such as Gray.

Workers on fixed offshore rigs are "amphibious workers" who spend almost their entire worklife either traveling on the navigable waters or laboring on statutorily covered pier-like areas immediately adjacent thereto. They are exposed on a daily basis to hazards associated with maritime employment. And most important, given the fact that workers on floating rigs are covered by the Act, the Court's result recreates exactly the type of "incongruous" coverage distinctions that Congress specifically sought to eliminate in 1972.

## II

The Court analyzes only the "maritime employment" status test, finding that that issue disposes of the case and makes unnecessary any discussion of "situs." Although the Court starts its analysis from the premise that "[t]he Act does not define the term 'maritime employment,'" *ante,* at 421, its own analysis of the term is quite conclusory and inadequate. The Court focuses on traditional admiralty law's treatment of fixed petroleum platforms, as found in a 1969 admiralty decision of this Court and a 1953 statute. It thus ignores that it was precisely the desire to break with traditional admiralty law's rigid locality-based distinctions that motivated Congress' passage of the 1972 LHWCA Amendments. Although the pre-1972 law cited by the Court was specifically based on those distinctions, the Court concludes that that law "foreclose[s]" the possibility that these workers might be engaged in "maritime employment." *Ibid.* The Court thus offers a conclusion that comports neither with the structure of the 1972 Amendments nor with our prior cases interpreting the Amendments' purposes. Instead, it derives its conclusion from straightforward pre-1972 applications of the very admiralty law concept that the 1972 Amendments

were intended to eliminate as a limit on LHWCA coverage—the concept that coverage should stop at the water's edge.

## A

The Court constructs its interpretation of "maritime employment" around the premise that the 1972 Congress had no desire to alter the law of *Rodrigue* v. *Aetna Casualty & Surety Co.*, 395 U. S. 352 (1969), a pre-1972 admiralty case that had nothing to do with the LHWCA. In *Rodrigue*, wrongful-death actions were brought in admiralty under the Death on the High Seas Act, 41 Stat. 537, 46 U. S. C. § 761 *et seq.*, when two petroleum workers were killed on fixed offshore platforms on the Outer Continental Shelf. One worker was killed using a crane on a platform to unload a barge, the other fell from a derrick high above a platform. *Rodrigue* presented the issue of whether admiralty jurisdiction existed with regard to these accidents, either by its own force or by force of the 1953 Outer Continental Shelf Lands Act (Lands Act), 67 Stat. 462, 43 U. S. C. § 1331 *et seq.* (prescribing choice of law to govern the Outer Continental Shelf). We unanimously held that traditional admiralty jurisdiction did not reach the situs of a fixed offshore rig, and that Congress, in passing the Lands Act, did not desire to alter this result.

The *Rodrigue* Court's reasoning as to admiralty law's inapplicability was straightforward, and is best found in a statement that has substantial irony, given the current Court's insistence that *Rodrigue* tells us what Congress meant in the 1972 LHWCA Amendments: The *Rodrigue* Court declared that "[a]dmiralty jurisdiction has not been construed to extend to accidents on piers, jetties, bridges, or even ramps or railways running into the sea." 395 U. S., at 360. *Rodrigue* concluded, as the Court now emphasizes, that drilling platforms have "'no more connection with the ordinary stuff of admiralty than do accidents on piers.'" *Ante*, at 421–422 (quoting 395 U. S., at 360). This may be so, but it is clear that the 1972 LHWCA Amendments were intended to expand LHWCA coverage well beyond the bounds of

traditional admiralty law. Most obviously, they were meant to reach accidents on the very piers that *Rodrigue* had analogized to fixed oil platforms. § 3(a), 33 U. S. C. § 903(a). *Rodrigue* correctly stated that fixed platforms (like piers), are localities unconnected with "the ordinary stuff of admiralty." 395 U. S., at 360. However, it is just as clear that the very purpose of the 1972 Amendments was to expand LHWCA coverage beyond the "ordinary stuff" of traditional admiralty jurisprudence.[4]

That *Rodrigue*'s holding was based on the application of admiralty's traditional locality test cannot be doubted, and it would likely have been so understood by Congress in 1972. For example, just prior to the 1972 LHWCA Amendments' passage, this Court cited *Rodrigue* as one of more than 40 cases following the traditional view that " '[i]n regard to torts . . . the jurisdiction of the admiralty is exclusively dependent upon the locality of the act.' "[5] Given this basis of *Rodrigue*, there is simply no necessary relation between that case and the meaning of the "maritime employment" status test under

---

[4] Indeed, we have explicitly refused to interpret the word "maritime" as used in the § 2(3)'s status test according to the limits that we have applied to the word's usage in the maritime jurisdictional statute. *Director, OWCP* v. *Perini North River Associates*, 459 U. S. 297, 320, n. 29 (1983) ("Although the term 'maritime' occurs [in] both . . . , these are two different statutes 'each with different legislative histories and jurisprudential interpretations over the course of decades' ") (quoting *Boudreaux* v. *American Workover, Inc.*, 680 F. 2d 1034, 1049–1050 (CA5 1982)).

[5] *Victory Carriers* v. *Law*, 404 U. S. 202, 205, and n. 2 (1971) (quoting Justice Story in *Thomas* v. *Lane*, 23 F. Cas. 957, 960 (No. 13,902) (CC Me. 1813). See also Swaim, Yes, Virginia, There Is An Admiralty: The *Rodrigue* Case, 16 Loyola L. Rev. 43 (1969–1970) (criticizing *Rodrigue* as an example of a particularly narrow application of the traditional locality test). In *Nacirema Operating Co.* v. *Johnson*, 396 U. S. 212, 215, n. 6 (1969), we stated that *Rodrigue* affirmed the "settled doctrine" that structures like piers were not within traditional admiralty situs. The 1972 Amendments, of course, explicitly overturned the application of this "settled doctrine" to the LHWCA.

the post-1972 LHWCA. Rather than mandate a result in the instant case, *Rodrigue* is irrelevant to its disposition.[6]

## B

The Court also focuses on the legislative history of the 1953 Lands Act, as discussed in *Rodrigue*, to show that long before the 1972 Amendments Congress had determined that workers on fixed platforms were not "engaged in maritime activity." *Ante*, at 422–423. But the 1953 determination was simply to provide law for the Outer Continental Shelf without altering the traditional locality test of admiralty coverage. There is no reason to assume that that decision governs the meaning of a 1972 statute that had nothing to do with the Outer Continental Shelf and was otherwise explicitly meant to alter this very admiralty rule. In that sense, the congressional intent behind the Lands Act might be as

---

[6] *Rodrigue*'s irrelevance to the meaning of the post-1972 "maritime employment" test is illustrated by the fact that one of the *Rodrigue* decedents, Dore, was killed in an activity that would clearly have been within post-1972 LHWCA coverage, using a crane to unload a barge that was docked at the oil rig. 395 U. S., at 353. Even under the analysis used by the Court today, such a worker would be "engaged in maritime employment." Yet in *Rodrigue*, Dore's unloading work and the other worker's oil derrick work were both viewed as equally beyond "the ordinary stuff of admiralty." *Id.*, at 360.

The Court defends *Rodrigue*'s relevance to this case in a curious way. The Court asserts that *Rodrigue* had gone beyond simply analogizing drilling platforms to piers, and actually *held* that drilling platforms "*are* islands." *Ante*, at 422, n. 6. This is put forth as if to imply that *Rodrigue*'s holding rested on something other than a simple analysis of traditional maritime tort locality. But relevant maritime law recognized no legal distinction between injuries on "piers" and injuries on "islands." Both were equally understood simply to be injuries on localities that were not "on the navigable waters." *Rodrigue*'s additional metaphor equating drilling platforms with islands added no additional legal point to that decision. It is, to say the least, peculiar to now look back on that opinion's casual choice of metaphors as a basis for determining the contours of subsequently created legal rights in an unrelated statute.

irrelevant to this case as is *Rodrigue's* discussion of traditional admiralty tort locality.

The irrelevance of *Rodrigue's* Lands Act analysis can best be seen by examining the point in the legislative history that *Rodrigue* most emphasized: The Lands Act Congress chose not to adopt admiralty law as the exclusive law for Outer Continental Shelf fixed platform workers because of those workers' close ties to shore communities. 395 U. S., at 361–365. Those ties gave offshore workers and shore communities a shared interest in those workers' continued access to state protective legislation. *Id.*, at 362. Because of this, the Lands Act Congress viewed "maritime law [as] inapposite to . . . fixed structures," *id.*, at 363; but that supports no inference that in 1972 Congress desired to exclude these workers from the LHWCA definition of "maritime employment."

In 1972, Congress clearly did not seek to limit LHWCA coverage according to a worker's connection to the shoreside community, and indeed, it is hard to argue that that was ever a factor limiting LHWCA coverage. First, the principal targets of both the 1972 expansion of coverage and the initial 1927 Act were longshoremen and harborworkers; both are groups significantly more closely tied to their shoreside communities than are offshore petroleum workers.[7] Second, Congress was well aware that workers on floating rigs had a long history of coverage under the LHWCA, see n. 1, *supra,* and yet they are not argued to be less "connected" to the

---

[7] While longshoremen and harborworkers work and live in the shoreside communities, offshore petroleum workers may work on facilities located in the open sea, and may be required to live on these facilities for prolonged periods of time. In the Gulf of Mexico, for example, the prevailing practice is for offshore workers to live on the drilling rigs for seven days, followed by seven days away from the rigs. International Labour Office, Safety Problems in the Offshore Petroleum Industry 19 (1978). This obviously makes the work less "connected" to the shore community. Respondent Gray testified that this was his schedule. Tr. in 77–LHCA–1308, before Administrative Law Judge, p. 31.

shore communities than are those on fixed platforms. Third, and most important, Congress provided that post-1972 LHWCA coverage—unlike traditional admiralty law coverage—would not deprive a worker of access to state remedies. "[T]he 1972 extension of federal jurisdiction supplements, rather than supplants, state compensation law." *Sun Ship, Inc.* v. *Pennsylvania,* 447 U. S. 715, 720 (1980). Congress thus made clear that there would be no incompatibility between "maritime" status and a close connection to the shoreside State.

In general, a close connection between an arguably "maritime" occupation and the shoreside community may very well form the basis of a decision not to exclusively apply admiralty law coverage to the affairs of that occupation. Indeed, that is just the rationale *Rodrigue* attributed to the Congress that passed the Lands Act. But, as is shown by the above factors, the same rationale cannot explain the coverage of the post-1972 LHWCA.[8]

Although *Rodrigue*'s analysis of the Lands Act is largely irrelevant to the issues in the instant case, a closer examination of the Lands Act as a whole reveals that its authors held views which actually support coverage in this case. In a number of instances unrelated to the *Rodrigue* case, the Lands Act evidences a congressional understanding that work on fixed offshore platforms has maritime attributes. Even though the Lands Act did not generally apply admiralty law to fixed rigs on the Outer Continental Shelf, it also did not leave the law of worker safety in the exclusive hands of the States. First, it explicitly provided for LHWCA coverage of Outer Continental Shelf fixed platform workers. See 43 U. S. C. § 1333(b). While application of the LHWCA to a locale does not necessarily indicate a congressional deter-

---

[8] It may be notable that in 1972 Congress explicitly overturned *Nacirema*'s holding that the LHWCA did not cover injuries on piers, but Congress has taken no action to overturn *Victory Carriers*' determination that workers on piers are not generally governed by admiralty law.

mination that the locale's activities are in some sense "maritime,"[9] the Lands Act goes substantially beyond this in indicating that there is a "maritime" component to worker safety problems on fixed oil rigs. In particular, Congress chose to vest authority for general safety regulation of fixed or floating platforms on the Outer Continental Shelf in the Coast Guard, "the agency traditionally charged with regulation and enforcement of maritime matters." *Pure Oil Co.* v. *Snipes*, 293 F. 2d 60, 66 (CA5 1961). See 43 U. S. C. § 1333(d). In accordance with that authorization, the Coast Guard promptly promulgated a code of safety regulations that reflected the existence of the same sort of hazards on these rigs as one would associate with "maritime" environments. See 21 Fed. Reg. 900 (1956).[10] Thus Congress and the Coast Guard have recognized that the offshore locality of platform workers' work significantly affects their working conditions.

## C

The Court's analysis in the instant case is flawed not only because it uses particularly irrelevant pre-1972 decisions to define the outer boundaries of "maritime employment," but

---

[9] Congress has used the LHWCA as a general worker's compensation statute in a variety of federal circumstances that have no maritime concerns. See *Perini*, 459 U. S., at 326, n. 1 (STEVENS, J., dissenting) (listing statutes that apply LHWCA to defense bases, the District of Columbia, etc.).

[10] The Fifth Circuit found in these initial regulations a determination that "whether . . . fixed or submersible, these oil well drilling structures located in the midst of the high seas present substantially all of the perils of the seas and are therefore to be regulated as such." *Pure Oil Co.* v. *Snipes*, 293 F. 2d 60, 66–67 (1961). The Coast Guard continues to regulate occupational safety and health on these structures, see 46 Fed. Reg. 2199 (1981) (Memorandum of understanding between U. S. Geological Survey and U. S. Coast Guard), and the regulations still reflect a concern for maritime dangers. See 33 CFR pts. 144 and 146 (1983) (requiring that platforms be equipped with buoyant work vests, life preservers, lifefloats, emergency communications equipment, general alarm systems, sufficient handrails, and buoys). See generally 33 CFR Subchapter N (1983).

also because its premise, that Congress understood "maritime employment" to be a clear pre-1972 concept, is itself highly suspect. In *Director, OWCP* v. *Perini North River Associates,* 459 U. S. 297 (1983), we emphasized that "maritime status" was a concept with little if any history in the LHWCA before the 1972 Amendments. See *id.,* at 307, n. 17. Its only appearance was in the requirement that an employee, to be covered, had to be employed by an employer "any of whose employees [were] employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock)." § 2(4), 33 U. S. C. § 902(4) (1970 ed.). Despite this language, "there was little litigation concerning whether an employee was in 'maritime employment' for purposes of being the employee of a statutory employer." *Perini, supra,* at 309–310. As a leading treatise describes the pre-1972 situation: "Workers who are not seamen but who nevertheless suffer injury on navigable waters are no doubt (or so the courts have been willing to assume) engaged in 'maritime employment' . . . . [N]o one seems to have doubted that they could recover under [LHWCA], provided only that the proof satisfied the 'navigable waters' test." G. Gilmore & C. Black, Law of Admiralty 428–430 (2d ed. 1975). Thus, in 1972, there was no well-defined occupational status concept of "maritime employment" within LHWCA jurisprudence. To the extent the concept had any pre-existing meaning, it implied very wide coverage of workers whose occupations required any regular presence on navigable waters. Cf. *Perini, supra.*[11]

---

[11] A status-like doctrine called "maritime but local," which was quite similar to the Court's position today, was found in the early years of the LHWCA. This doctrine applied state rather than federal law to govern accidents on the waters if the worker's activities had no "direct relation" to navigation or commerce and if "the application of local law [would not] materially affect" the uniformity of maritime law. *Grant Smith-Porter* v. *Rohde,* 257 U. S. 469, 477 (1922). See also *Western Fuel Co.* v. *Garcia,* 257 U. S. 233, 242 (1921). Like the Court's approach, this concept was ill-defined, and it gave rise to "one of the most flourishing, as it was surely

## III

After erroneously determining that its decision in this case is mandated by *Rodrigue* and the legislative history of the Lands Act, the Court turns to its formulation of a "test" for "maritime employment." Its discussion of the statutory language, legislative history, and prior Court interpretations of the "maritime employment" provision of § 2(3) is quite brief. Much of it is little more than a determination that in our prior cases and in the legislative history offshore drilling work was never specifically stated to be covered by the statute. See *ante*, at 423–424. Of course, none of these sources had ever purported to offer an exclusive list of covered occupations, and as the Court agrees, we have previously read the "maritime employment" concept as "not limited to the occupations specifically mentioned in § 2(3)." *Ante*, at 423. Nevertheless, the Court's analysis presumes there is little coverage outside the specific occupations listed.

The only "test" that the Court comes close to announcing seems to involve an inquiry into whether an occupation is sufficiently related to maritime commerce (which seems to be confined to ship construction and cargo moving, *ante*, at 423–424) for it to be within a class of tasks "inherently maritime." *Ante*, at 425. The Court offers no justification for why the category should be so limited, nor does it seriously evaluate whether fixed offshore rig workers could fall into the cate-

---

the most depressing, branches of federal jurisprudence." G. Gilmore & C. Black, Law of Admiralty 420 (2d ed. 1975). See also *Perini, supra,* at 307. This Court eventually established that the LHWCA did not incorporate the "maritime but local" doctrine. See *Calbeck* v. *Travelers Insurance Co.*, 370 U. S. 114 (1962); cf. *Davis* v. *Department of Labor*, 317 U. S. 249 (1942); *Parker* v. *Motor Boat Sales*, 314 U. S. 244 (1941). More recently, this Court has explicitly held that the 1972 status requirement of § 2(3) did not reinsert in the Act this "concept that plagued maritime compensation law for more than 40 years." See *Perini, supra,* at 322. Unfortunately, the Court today comes quite close to accomplishing just that reinsertion.

gory of "maritime commerce." The content of such a category is not as self-evident as the Court assumes,[12] nor would all agree that offshore rig workers are self-evidently "non-maritime." [13]

This "test" is adopted in spite of the fact that no prior decisions of this Court have held the status test to be so limited. *Caputo* and *P. C. Pfeiffer Co.* which the Court cites as if they had established those limits, *ante*, at 423–424, were decisions that analyzed the concept of occupational status as it applied to different aspects of longshoring operations. Although those decisions contain important discussions concerning the structure and history of the Act, the only discussions on the limits of "maritime employment" were within the particular factual setting of those cases, that is, the decisions only sought to distinguish among those occupations normally found on a pier during the loading and unloading of a

---

[12] For example, the Court accepts shipbuilding, which is included among § 2(3)'s enumerated occupations, as obviously "maritime." But contracts for shipbuilding were not traditionally considered within admiralty contract jurisdiction. See *People's Ferry Co.* v. *Beers*, 20 How. 393 (1858). See also Gilmore & Black, *supra*, at 16.

[13] For example, Gilmore and Black begin their treatise with a list of cases that are not within admiralty jurisdiction, but which might be considered intuitively "maritime." *Rodrigue* is among them. Gilmore & Black, *supra*, at 27. See also Alston, Admiralty Jurisdiction and Fixed Offshore Drilling Platforms: A Radical Plea Reconsidered, 28 Loyola L. Rev. 379 (1982) (urging admiralty coverage for workers on fixed platforms); Robertson, Injuries to Marine Petroleum Workers: A Plea for Radical Simplification, 55 Texas L. Rev. 973 (1977) (same). The Court's assertion that offshore oil workers are not engaged in "maritime commerce" is similarly conclusory. In contrast, the Court of Appeals concluded that extracting oil and gas from under the ocean floor and transporting it to the shore is a part of "maritime commerce." See 703 F. 2d 176, 180 (CA5 1983); see also *Pippen* v. *Shell Oil Co.*, 661 F. 2d 378, 384 (CA5 1981). Leaving aside intuitions about what constitutes "maritime commerce," I would note that the enterprise here is the same as that carried out by floating rigs, which are classified as vessels, see n. 1, *supra*, and are thus presumably within almost any definition of "maritime commerce."

ship. The decisions did not purport to limit the Act's coverage to that particular setting, nor did they try to define any precise limits for the occupational status test outside that setting.

In *Perini*, we held that a construction worker injured while working on a barge during the construction of a riverside sewage treatment plant was "engaged in maritime employment." Although *Perini*'s precise holding concerned only the occupational status of a worker injured while required to be on the actual navigable waters, the necessary implications of that holding are of course not limited to the facts of that case. The Court reads *Perini* as having no importance to an understanding of what the term "maritime employment" might mean outside the situation where a worker is injured on the actual navigable waters. *Ante*, at 424–425, n. 10. But the statute applies the term "maritime employment" to all coverage situations, with no hint that its meaning should radically change depending on an injury's exact situs. See *P. C. Pfeiffer Co.*, 444 U. S., at 78–79. Nor does the Act's structure or language allow for an interpretation that, in effect, exempts workers injured on the actual navigable waters from the requirement that they be "engaged in maritime employment." *Perini* declined to rest on a rationale that focused only on the situs of the injury. It instead saw location as significant principally because an occupation's location is an aspect of the occupation's status.

> "[W]e emphasize that we in no way hold that Congress meant for such employees to receive LHWCA coverage merely by meeting the situs test, and without any regard to the 'maritime employment' language. . . . We consider those employees to be 'engaged in maritime employment' not simply because they are injured in a historically maritime locale, but because they are required to perform their employment duties upon navigable waters." 459 U. S., at 323–324.

Although in the instant case the particular injury did not occur on the actual navigable waters, and in *Perini* it did, Gray's work did involve his repeated and required presence on the navigable waters. *Perini* and its approach to the status test are thus highly relevant.

*Perini* is also relevant because it repeatedly refused to rest its holding on any inquiry into whether the claimant's work had a "direct" or "substantial relation" to navigation or traditional notions of maritime commerce. See *Perini*, 459 U. S., at 311, n. 21, 315, 318. Such a test was urged on the Court as a test that would deny coverage to the claimant, and *Perini*, after extensively discussing the Act's history, see n. 11, *supra,* firmly concluded that the 1972 Congress did not mean to incorporate such an inquiry into the analysis of occupational status. The Court today offers an analysis quite close to that which *Perini* explicitly rejected.

## IV

To determine whether an offshore fixed platform worker is "engaged in maritime employment" the Court should have turned to three principles that we have previously applied to such questions. First, prior cases make clear that we must interpret coverage in light of the overall purposes of the Act. A major purpose of the 1972 Amendments was to eliminate those aspects of the prior system that made coverage depend on the "fortuitous circumstance of whether the injury occurred on land or over water," S. Rep., at 13; H. R. Rep., at 10, and to provide workers with a "uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity." *Id.,* at 10–11. Cf. *Sun Ship,* 447 U. S., at 725–726 ("The legislative policy animating the LHWCA's landward shift was remedial [and] the amendments' framers acted out of solicitude for the workers").

Second, we have said that Congress' concerns in extending coverage went beyond a concern for the exact locations of any

particular worker's work routine, and in that sense "maritime employment" is an "occupational rather than a geographic concept." *P. C. Pfeiffer Co., supra,* at 79.

Third, we have said that a major factor in the determination of "maritime employment" is whether the members of an occupation are "required to perform their employment duties upon navigable waters." *Perini, supra,* at 323–324.

## A

In applying these principles to this case, it becomes clear that offshore fixed oil platform workers should be considered in "maritime employment." When viewed from an occupational perspective, it is a glaring fact that unless classified as Jones Act seamen, see n. 3, *supra,* all offshore oil rig workers who work on floating rigs are engaged in maritime employment for LHWCA purposes, for they all must work "on the actual navigable waters." See *Perini, supra,* at 323. See also n. 1, *supra.* Other than the fact that their rigs were a traditional admiralty situs, there is little to distinguish the job or location of a worker on a floating rig from those of a worker on a fixed rig. Physically, the structures may be quite similar.[14] For example, they are similarly small,[15] relatively isolated, and totally surrounded by the sea. The two types of structures are parts of similar enterprises and opera-

---

[14] See, *e. g.,* International Labour Office, *supra* n. 7, at 5 ("Jack-up rigs," which make up 42% of the world's floating rigs, are "self-elevating platforms equipped with legs which can be lowered until they reach the sea bed and support the main section of the drilling platform. Throughout the drilling process the platform is kept in the raised position above the water surface"). See also n. 1, *supra.*

[15] Although the record does not reflect the platform's size in this case, fixed and floating platforms are of similarly limited size. See Hearings on S.2318 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., 836 (1972) (hereinafter cited as Hearings) (oil company document calling a fixed platform with a "150-foot-square deck" a "real giant"); *id.,* at 834 (floating rig described as having a 200-foot-square deck).

tions that are carried out in the same marine environment. Indeed, other than for the type of structure, the locations of the work are the same. Moreover, the work tasks are quite similar, as are the working conditions and hazards.[16] I can therefore see no reason to believe that Congress, in passing a measure designed to rationalize coverage patterns through an occupational test for coverage, would have wanted to treat these workers as belonging to two different occupations, one maritime and the other nonmaritime.[17]

In *Perini* we held that the fact that a worker is required to work over the actual navigable waters is weighty evidence of his or her maritime status. 459 U. S., at 323–324. This holding clearly calls for the inclusion of fixed rig workers within the maritime employment classification. Here, Gray's job was to do welding, as needed, on oil rigs scattered over the Bay Marchand oil field. He was thus required to live

---

[16] Counsel for petitioners went so far as to declare: "The hazards are no different. . . . There are no differences at all. There is absolutely no difference between a person who is more or less permanently assigned to a vessel and drilling or a person who is more or less permanently assigned to a platform and drilling." Tr. of Oral Arg. 6.

[17] Beyond the similarity of the two classifications, additional factors militate against treating them as distinct occupations. For example, some workers work on both fixed and floating rigs. See, *e. g.*, *Pippen* v. *Shell Oil Co.*, 661 F. 2d, at 383, n. 6 (75% of worker's time was on floating rigs and 25% on fixed rigs). Similarly, the distinction between "fixed" and "floating" rigs is not always a rigid one. Structures called "tender type platforms" include a fixed platform with floating "tender ships" moored adjacent thereto. See Hearings, at 480; W. Graff, Introduction to Offshore Structures 3, 25 (1981). The drilling operation is divided between the platform and the tender ship, and the two are usually connected by walkways so workers can move back and forth between them. See Robertson, 55 Texas L. Rev., at 997–998. In both these contexts, the Court's approach creates the same "walking in and out of coverage" situation that the 1972 Amendments sought to eliminate. Cf. *id.*, at 992 ("Admiralty law is notable for the presence of fine and often intuitively questionable distinctions that involve devastating consequences. But even within the context of a system accustomed to such line-drawing [the fixed/floating rig distinction] looks peculiar" (footnotes omitted)).

on a rig and regularly travel back and forth over water among the rigs in the oil field. The argument that Gray performed work over the actual navigable waters is trivialized by the Court when it characterizes him as "a worker whose job is entirely land-based but who takes a boat to work." *Ante*, at 427, n. 13. This was not simply the life of a land-based commuter who chose to travel to work by boat, it is the life of someone required to live and work in a marine environment and to engage in ocean travel as an integral part of his job duties. When traveling among the rigs he was no less at work than when he was on a rig doing welding jobs, so his job is one that requires his presence on the actual navigable waters.

The maritime nature of the occupation is even more apparent from examining its location in terms of the expanded situs coverage of the 1972 Amendments. Assuming that a fixed offshore platform is a covered situs under § 3(a), then fixed platform workers could not simply be termed "land-based" workers. *Ibid.* Unlike typical "land-based" workers, they would spend virtually their entire work lives within the statute's covered "maritime situs"—that is, either on or immediately adjacent to the actual navigable waters. This is in fact the situation here, for a fixed offshore oil rig easily fits into § 3(a)'s situs test.

Section 3(a) provides that coverage extends to any "pier, wharf, dry dock, terminal, building way, marine railway, or other . . . area [adjoining the navigable waters] customarily used by an employer in loading, unloading, repairing, or building a vessel." 33 U. S. C. § 903(a). This describes the typical fixed offshore oil rig. Since a fixed rig is of limited size and completely surrounded by water, all materials and workers on the rig are brought there and unloaded over water, and thus a customary use of the rig is the loading and unloading of cargo and people. One commentator has characterized the situation as follows:

"Worker transportation is one of the most basic problems associated with offshore operations. Transportation is accomplished either by boats or helicopters. High-speed crew boats transport work crews when time is available and the distance is less than about 50 miles. Helicopters transport crews and other personnel over long distances or when time is important. The transportation of equipment to offshore rigs is accomplished with work boats. These boats . . . are versatile, high powered, and essential to offshore operations. Thus, all platforms must be provided with mooring bits, bumpers, cranes, stairs, etc., for use with work boats and crew boats." W. Graff, Introduction to Offshore Structures 3 (1981).

The rig is thus an "area [adjoining the navigable waters] customarily used by an employer in loading [or] unloading . . . a vessel." § 3(a), 33 U. S. C. § 903(a).

Fixed rigs are also physically quite analogous to piers or wharves. They are of limited size, see n. 15, *supra*, so a worker almost anywhere on the deck would be aware of his close proximity to the water. Similarly, the decks are elevated over the water, built to provide access to the water, and situated so that working conditions are influenced by the surrounding marine environment. Given these factors, I have little problem classifying the whole of the platform as a covered situs,[18] either because it is an "other adjoining area customarily used by an employer in loading [or] unloading" or because it is analogous to a pier or wharf facility.

Given this determination, a fixed platform worker is quite distinct from the truckdriver or clerical worker who in the

---

[18] In *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249, 279–280 (1977), we held that the whole of a facility adjoining the water was a covered situs where part of the facility was used for loading vessels. See G. Gilmore & C. Black, Law of Admiralty 424 (2d ed. 1975) (urging a broad reading of the situs test to avoid unnecessary line-drawing problems).

legislative history exemplifies the nonmaritime worker. See *supra,* at 430–431. Truckdrivers or clericals are land-bound workers whose work never takes them on the actual navigable waters, and only sporadically takes them on the pier-like areas brought under the LHWCA's coverage by the 1972 Amendments. The greatest part of their work is done in inland locales that are clearly beyond the coverage of the Act. Therefore, coverage of these workers under the Act could at most be "checkered" and "fortuitous." Avoiding such widespread "checkered coverage" was an envisioned function of the status test. See *supra,* at 430–432. Fixed rig workers, in contrast, are in a position to benefit from uniform coverage if classified as "maritime," for they are on a covered situs for the overwhelming part of their work. Classifying them as "maritime" in light of their constant and required presence on a covered situs conforms to Congress' desire for uniform coverage of those workers who would otherwise be partially covered. Under the Court's approach, they remain only partially covered.

A last reason for classifying these workers as maritime is that they face working conditions and hazards associated with their maritime location. This was clearly stated in the testimony of a high official of an offshore drilling company before a recent congressional hearing on offshore worker safety:

> "Offshore work has a special set of concerns because we are a hybrid industry. In one sense, we are an onshore industry that initially crept out over the water. But it is equally fair to characterize us as a maritime industry, the same as the merchant marine or any other.
>
> "In point of fact, we share all of the concerns of both the drilling and maritime industries, plus a few uniquely ours." [19]

---

[19] Hearing on the Safety of Life at Sea and Safety on Oil and Gas Rigs on the Outer Continental Shelf before the Subcommittee on Panama Canal/Outer Continental Shelf of the House Committee on Merchant

The same sentiment is recognized in the delegation of regulatory authority to the Coast Guard and in the Coast Guard regulations, see n. 10, *supra*, and accompanying text, and has been noted by legal and occupational health authorities.[20] Clearly these workers do far more than just "breathe salt air." See *ante*, at 423.

### B

The Court supports its conclusion that fixed offshore oil rig workers are nonmaritime by arguing that their work is similar to drilling work done on land. But this reasoning must fail for a number of reasons. First, it ignores that while the work is similar to work done on land, it is virtually identical to work on floating oil rigs—which is clearly maritime.

Second, the Court's reasoning ignores that many indisputably maritime occupations are quite analogous to nonmaritime occupations. A forklift or crane operator who moves cargo on a pier and a "checker" who inventories that cargo are considered longshoremen with maritime status, even though their work may be quite similar to that of inland workers in a warehousing operation. See *Caputo*, 432 U. S., at 249 ("checker" was engaged in "maritime employment"); see also *Perini*, 459 U. S. 297 (1983) (construction worker may be engaged in "maritime employment"). The issue is not whether job duties are similar to those of nonmaritime workers, but whether the enterprise in question

---

Marine and Fisheries, 98th Cong., 1st Sess., 38 (1983) (testimony of T. S. McIntosh, executive vice-president and chief operating officer of the Zapata Corp. and president of the Zapata Off-Shore Co.).

[20] See Alston, 28 Loyola L. Rev., at 402–403; Robertson, 55 Texas L. Rev., at 994–996. See also International Labour Office, *supra* n. 7, at 19 (exposure to weather); *ibid.* (extended isolation may lead to morale, alcoholism, and safety problems); *id.*, at 21–23 (controlling fires and blow-outs may .be more difficult because of inaccessibility of platform); *id.*, at 24 (confined space and isolation makes excessive noise a much more serious problem in offshore oil operations than in onshore oil operations); *id.*, at 27 (slipperiness, clutter, weather conditions, and danger of falling overboard can make transfer of supplies dangerous).

necessitates that work be done in a maritime environment. Longshoring work, regardless of its similarity to other jobs, must be done on or adjacent to the navigable waters. Similarly, the extraction of oil from beneath the ocean floor necessitates that certain tasks be done over and adjacent to the ocean.

Third, the Court's reasoning ignores that whatever the similarities to land-based work, the work schedules, working conditions, and job hazards of offshore workers are in some ways quite different from their land-based counterparts. And most of the differences are the result of the offshore workers' proximity to the sea. See *supra,* at 448–449.

## V

For the reasons discussed above, respondent Gray was "engaged in maritime employment" within the meaning of § 2(3) of the Act. It is also clear that a fixed offshore petroleum platform is a covered situs within the meaning of § 3(a) of the Act. I would thus affirm the Court of Appeals.