Charles WEST

v.

**CHEVRON U.S.A., INC., Y & S Marine Company, and XYZ Insurance Company.**

**William Larry DEAN**

v.

**CHEVRON OIL COMPANY, Ocean Transportation Systems, Inc., XYZ Insurance Company and the M/V Redeemer, her engines, tackle, furniture & all appurtenances et cetera, in rem.**

Civ. A. No. 84–1244, 84–5227.

United States District Court, E.D. Louisiana.

Aug. 8, 1985.

A. Remy Fransen, Jr., of Wiedeman & Fransen, New Orleans, La., for plaintiffs Charles West and William Larry Dean.

Michael McAlpine and John Peuler of Johnson & McAlpine, New Orleans, La., for Ocean Transp. System.

George B. Jurgens, III, Louis Simon, II, Kennedy J. Gilly, Jr., and Michael R.C. Reiss of Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for Chevron USA, Inc.

## OPINION

FELDMAN, District Judge.

Once again the Court plunges into the murky waters of choice of law—this time, to resolve whether Admiralty law or state law through the Outer Continental Shelf Lands Act applies to an accident on the Outer Continental Shelf off the Coast of Louisiana. If Admiralty law applies, then plaintiffs may sail smoothly on to pursue the merits of their case. If Louisiana law applies as surrogate federal law through the Lands Act, then plaintiffs have abruptly run aground. Prescription will bar their claims against Chevron.

This matter comes before the Court on Defendant Chevron's motion for summary judgment dismissing plaintiffs' claims against it on the ground that prescription has run on their claims. The undisputed material facts giving rise to this motion are unremarkable.[1]

Plaintiffs sued Chevron to recover damages for personal injuries they allegedly sustained when they were dropped from a personnel basket onto a vessel, the M/V REDEEMER. The personnel basket ran from a fixed offshore platform on the Outer Continental Shelf off the Coast of Louisiana to the vessel, which hovered in the area of the platform. Chevron owned the platform. It also time-chartered the vessel, which was used to transport employees from the structure on which workers slept to the structures on which they worked. At the time of the incident, plaintiffs were being transferred in the basket from the fixed platform to the vessel.

Transfer of the basket back and forth was accomplished by means of a crane. The crane was affixed to the platform. A Chevron employee operated the crane. Workers were transferred by standing on the base of the basket. They held on to the netting sides of the basket as the crane swung the basket over the side of the platform and lowered it onto the deck of the vessel.

The incident in question occurred on April 23, 1982. Plaintiff Charles West filed suit on March 13, 1984. He filed a supplemental and amending complaint on September 12, 1984. Plaintiff William Larry Dean filed suit on October 29, 1984. The suits were consolidated on December 5, 1984.

The issue on which this motion turns is whether Admiralty law or state law as surrogate federal law through the Outer Continental Shelf Lands Act applies to plaintiffs' claims against Chevron. Considering the memoranda, supplemental memoranda and supporting exhibits submitted by the parties, the arguments of counsel during oral argument and the law applicable to this case, the Court grants Chevron's motion for summary judgment and holds that state law through OCSLA governs plaintiffs' claims. They are, therefore, prescribed.

The analysis begins with *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 493, 93 S.Ct. 498, 34 L.Ed.2d 454

---

**1.** They present, however, another of those "perverse and casuistic borderline situations" that led the Supreme Court to supplement the locality test of maritime tort jurisdiction with a maritime nexus requirement. See *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 93 S.Ct. 493, 498, 34 L.Ed.2d 454 (1972).

(1972) and its progeny, even though *Executive Jet* dealt with the scope of admiralty jurisdiction and the instant case deals with choice of law. Choice of law questions in cases such as the one before the Court "traditionally have been analyzed in jurisdictional terms ... because 'once admiralty jurisdiction is established, then all of the substantive rules and precepts peculiar to the law of the sea become applicable'". *In Re Dearborn Marine Service, Inc.*, 499 F.2d 263, 277 n. 27 (5 Cir.1974).[2]

■■■ Under *Executive Jet* and its progeny, the Court focuses on two inquiries: 1) the locality of the wrong; and 2) maritime nexus to the wrong. In examining the locality of the wrong the Court must look at the place the injury occurred, that is: the place where the alleged negligence took effect, rather than where the act of negligence occurred.[3]

In this case, it is undisputed that the negligence took effect and the injury occurred on the vessel M/V REDEEMER, a vessel on navigable waters. It thus is clear that the locality prong of the *Executive Jet* test is met in this case. That conclusion does not, however, end the Court's inquiry.

Under *Executive Jet*, the Court must decide whether the requisite maritime nexus is also present. It is that inquiry which focuses attention on the difficult dimension of the issue raised. And it is that inquiry which centers on a fundamental policy consideration: How expansive a view should courts take of what Admiralty law should reach?

The test of maritime nexus is whether the negligence bears a significant relationship to traditional maritime activity. *Exec-*

*utive Jet*, 93 S.Ct. at 504. *Helaire* at 1042. In assessing whether the negligence bears a significant relationship to traditional maritime activity, the Court addresses four considerations: 1) the functions and roles of the parties involved; 2) the types of instrumentalities involved; 3) the nature and cause of the accident and the type of injury; 4) traditional concepts of the role of admiralty law. *Kelly v. Smith, supra.* Considering each of these factors in light of the facts of this case, the Court is compelled to conclude that maritime nexus is lacking in this case. The negligence fails to bear a significant relationship to traditional maritime activity even though the injuries happened on a vessel in navigable waters.

*Functions and Roles of the Parties*

It is undisputed that plaintiffs were the quintessential platform workers. At the time of the incident, they were being lifted in a personnel basket manipulated by a platform-based crane from Chevron's platform to the vessel M/V REDEEMER. The vessel hovered between 2 and 130 feet away from the platform at the time of transfer.

Chevron wore two hats in this case; that of platform owner and that of time charterer of the vessel. The activity in which it was engaged at the time of the accident, however, was non-maritime—the operation of a platform-based crane.

Plaintiffs seize on the fact that Chevron was the time-charterer of the vessel. They strenuously argue that, as such, Chevron had the status of vessel owner. Plaintiffs, with admirable enterprise, further liken themselves to passengers or cargo being transported on a vessel or a vessel-equivalent across navigable waters.[4] They urge

---

**2.** See also *Helaire v. Mobil Oil Co.,* 709 F.2d 1031 (5 Cir.1983), in which the court, without comment, used this jurisdictional analysis to resolve the choice of law question.

**3.** *In Re Dearborn, supra; Kelly v. Smith,* 485 F.2d 520 (5 Cir.1973); *Harville v. Johns-Mansville Products Corp.,* 731 F.2d 775 (11 Cir.1984). *Helaire, supra.*

**4.** They apparently seek to characterize themselves as cargo or passengers through two

routes. First, they urge that the very fact of their being transferred in the personnel basket from the platform to the vessel is tantamount to their being transported like cargo or passengers across navigable waters. Additionally, they argue that they were passengers of the M/V REDEEMER by virtue of the fact that they were being transferred to the Redeemer to be transported in that vessel.

that Chevron therefore owed them a duty of safe egress from the basket and ingress onto the Redeemer.

The Court rejects plaintiffs' characterization of the roles of the parties. The Court recognizes that courts have deemed non-vessels such as helicopters that ferry workers back and forth from shore to offshore drilling structures to be functionally vessel-equivalents [5] to establish the requisite maritime flavor to an accident. But this Court is not persuaded that a personnel basket operated from a platform-based crane, and which was used to transfer workers at most something over a hundred feet, performs a sufficiently similar function or is of the same genre. Therefore, the Court rejects plaintiffs' assertion that they have passenger status by virtue of being transferred in the basket.

Similarly, the Court rejects plaintiffs' contention that they were passengers because their destination was a vessel on which they would be transported across navigable waters to another platform. Plaintiffs have failed to bring to the Court's attention any case which takes so broad a view of who is a passenger and when a vessel's duty to passengers or intended passengers commences. To accept plaintiffs' argument would be to conceptually ignore the centerpiece of this puzzle: the fixed platform activities (which are non-maritime) that cannot be unbundled from the events at issue.

*Instrumentalities*

Likewise, the critical instrumentalities involved in this case are peculiarly non-maritime. As noted, they are a platform-based crane that operated a personnel basket. There is nothing uniquely maritime about these instrumentalities. In so finding, the Court does not ignore the presence of the vessel at the scene of the accident. But the vessel was a passive factor, and the fact of its fortuitous involvement does not change the result here. That plaintiffs were injured when they landed on the vessel was mere happenstance; if the injuries had occurred on the platform, state law

would clearly apply. It is precisely the fortuity of the location of an accident that led the Supreme Court to shift the analysis of jurisdictional issues away from a pure locality test to a test of locality plus maritime nexus. The Court acknowledged that "there has existed over the years a judicial, legislative and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test." *Executive Jet*, 93 S.Ct. at 501.

It is important that courts not lose sight of this policy consideration. Further, as the Court already has mentioned, it is not persuaded that the personnel basket performed a function which renders it a vessel-equivalent. This case therefore is distinguishable from *Ledoux*.

*Nature and Cause*

The nature and cause of the accident were platform, not vessel-related. It is undisputed that the cause of the accident was the allegedly negligent operation of the platform-based crane by a Chevron employee. Since there was no "causal operational relation" between the vessel and plaintiffs' resulting injuries as noted in *Lanasse v. Travelers Insurance Company*, 450 F.2d 580, 584 (5 Cir.1971), the Court cannot properly characterize the cause of the accident and injury as "vessel-related". What is pivotal here is the fact that the injury was caused by clearly non-vessel operations.

Plaintiffs cannot magically transform platform negligence into vessel-related negligence by characterizing themselves as cargo or passengers, or, as we have seen, by seizing on the fact that Chevron time-chartered the vessel on which plaintiffs fortuitously landed. While the Court recognizes that vessels owe certain duties, including a duty of safe ingress and egress to persons who actually are passengers or

---

5.   Cf.: *Ledoux v. Petroleum Helicopters, Inc.*, 609   F.2d 824 (5 Cir.1980).

who are imminently about to become passengers, it cannot accept plaintiffs' self-characterization as passengers or cargo or their characterization of the personnel basket as a vessel or vessel-equivalent. Plaintiffs' reasoning would expand a vessel's duty to the point of absurdity. Under plaintiffs' reasoning, they became "passengers" and the vessel's duty arose while they were still on the platform, and at the moment they were about to enter the personnel basket.

*Type of Accident or Injury*

Nor was the type of accident or injury in this case peculiarly maritime. The accident and resulting injuries could have been sustained on a platform or land-based rig as well. As previously noted, the landing of plaintiffs on the vessel was mere happenstance. It is helpful to underscore that. If they had been going from the vessel to the platform rather than from the platform to the vessel, they might have landed on the platform instead, and sustained the same injuries.[6]

*Traditional Concepts of the Role of Admiralty Law*

■ Finally, the traditional concepts of the role of admiralty law compel this Court to hold that state law through OSCLA rather than Admiralty law, governs plaintiffs' claims against Chevron. The purpose of Admiralty law is to safeguard the understandable national interest in uniformity of law and remedies for those facing the hazards of waterborne transportation. *Kelly v. Smith supra.* But that national interest simply is not implicated in this case. Plaintiffs were not facing hazards peculiar to waterborne transportation when they were lifted and moved in a basket attached to a crane mounted on a fixed platform from the platform to a vessel hovering between 2 to 130 feet away.

■ The Court further emphasizes that the Supreme Court, beginning with *Executive Jet* and *Foremost Insurance Company v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), and more recently in *Herb's Welding v. Gray,* — U.S. ——, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985), has taken a restrictive view of what is maritime and what falls within Admiralty jurisdiction. The Supreme Court seems to be saying that expansive notions of what is in the Admiralty are viewed with disfavor. In *Herb's Welding,* for example, the Supreme Court pointed out that "The Fifth Circuit's expansive view of maritime employment is ... inconsistent with our prior cases under the 1972 Amendments to the LHWCA. The expansion of the definition of navigable waters to include rather large shoreside work areas necessitated an affirmative description of the particular employees working in those areas who would be covered. This was the function of the maritime employment requirement. But Congress did not seek to cover all those who breathe salt air. Its purpose was to cover those workers on the situs who are involved in the essential elements of loading and unloading...." 105 S.Ct. 1421, 1427 (1985). This Court heeds the signal of the Supreme Court, and believes it is a healthy sign. In this case, the great weight of the relevant factors militates against application of Admiralty law. To rule otherwise, in this context, would require too expansive a view of what belongs in Admiralty.

To summarize, nothing about plaintiffs' injuries or the accident itself except the fortuity of its culmination on the deck of a vessel exudes maritime flavor. Nothing calls into play the unique interests of Admiralty. Neither the risks to which plaintiffs were exposed, nor Chevron's alleged breaches were peculiarly Admiralty-related. The risks and breaches did not involve the duty of a vessel-equivalent to her passengers.[7]

6. Had they landed on the platform rather than on the vessel, *Wallace v. Texaco,* 681 F.2d 1088 (5 Cir.1982) makes clear that state law through OCLSA would apply. "Because Wallace was injured on a fixed platform on the outer conti-nental shelf, his cause of action is governed by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq."

7. A different result would be reached if plaintiffs actually had been passengers on a vessel or

Considering all of these factors, the Court finds that the requisite maritime nexus is lacking in this case. The Court therefore holds that state law, applied as surrogate federal law through the Outer Continental Shelf Lands Act, applies to plaintiffs' claims against Chevron.

The Court recognizes that its application of state law through OCSLA in this setting might be viewed as an extension of OCSLA beyond the precise physical limits of the fixed offshore platform. In this Court's view, however, the personnel basket attached to the crane affixed to the platform was itself an extension of the platform. In all events, nothing in the legislative history of OCSLA suggests that Congress intended for OCSLA to be limited to the four corners of the platform. Indeed, other courts have refused to limit the application of OCSLA to the precise physical limits of the fixed offshore platform.[8]

Having determined that state law through OCSLA applies to plaintiffs' claims against Chevron, the Court is obliged to dismiss these claims on grounds of prescription. The applicable prescriptive period under Louisiana law is one year.[9] Plaintiffs brought suit more than one year after the accident and injury.

Accordingly, Chevron's motion for summary judgment dismissing plaintiffs' claims against it is GRANTED.

---

an instrumentality performing the function traditionally performed by a vessel on navigable waters. See e.g.; *In Re Dearborn supra* for its treatment of the platform worker Monk's claims against the owner of the vessel on which he was injured as distinguished from its treatment of his claims against the platform owners. In the case before this Court, however, plaintiffs were not being transported across navigable waters in a sense that implicates maritime concerns.

8. Cf. *In Re Dearborn, supra; Oliver v. Aminoil, USA, Inc.,* 662 F.2d 349 (5 Cir.1981); *Bible v. Chevron Oil Co.,* 460 F.2d 1218 (5 Cir.1972) cert. den. 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972); *Bertrand v. Forest Corp.,* 441 F.2d 809 (5 Cir.1971) cert. den., 404 U.S. 863, 92 S.Ct. 106, 30 L.Ed.2d 107 (1971).

9. LSA C.C. Art. 3536.