DeMOSS, Circuit Judge,
dissenting:
Because the panel majority arrives at their decision in this case without consideration of three Supreme Court cases and two statutory amendments which I think require a different conclusion, I respectfully dissent.
Rodrigue — The First Supreme Court Case
On August 7, 1953, the United States Congress passed the Outer Continental Shelf Lands Act (hereinafter “OCSLA”), which extended federal law (and adjacent state law) “to the sub-soil and seabed of the Outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom.” See § 4(a)(1), 67 Stat. 642 (emphasis added).[1] The extension of federal law contemplated by this provision was to be “to the same extent as if the Outer Continental Shelf were an area of exclusive federal jurisdiction located within a state.” Id. The subsequent sub-paragraph of this same section provided that the civil and criminal laws of each adjacent state “are hereby declared to be the law of the United States for that portion of the sub-soil and seabed of the Outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the state if its boundaries were extended sea *505 ward to the outer margin of the Outer Continental Shelf.”[2]
This Circuit considered the significance of these statutory provisions in two cases, Dore v. Link Belt Co., 391 F.2d 671 (5th Cir.1968), and Rodrigue v. Aetna Casualty & Surety Co., 395 F.2d 216 (5th Cir.1968). Each of these cases involved the death of a worker which occurred on a drilling rig on a fixed platform on the Outer Continental Shelf. In each case, the plaintiff sought relief under Louisiana state law, which they contended was made applicable by OCSLA. The defendants contended that relief could only be made under the Death on the High Seas Act (“DOHSA”). In holding that relief was available only under DOHSA, the Fifth Circuit stated:
We think that a consideration of both intrinsic and extrinsic factors requires the conclusion that it was the intention of Congress that (a) this occurrence be governed by Federal, not State, law, and (b) that the Federal law thereby promulgated would be the pervasive maritime law of the United States. In connection with the latter phase — the choice by Congress of maritime law — it is again important to keep in mind that we are in an area in which Congress has an almost unlimited power to determine what standards shall comprise the Federal law.
Dore, 391 F.2d at 675 (quoting Pure Oil Co. v. Snipes, 293 F.2d 60, 64 (5th Cir.1961)).
The Supreme Court granted certiorari in both cases, which were argued together. In an opinion covering both cases, Ro-drigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), the Supreme Court in an unanimous decision written by Justice White, reversed the decisions of the Fifth Circuit and stated:
In light of the principles of traditional admiralty law, the Seas Act [DOHSA], and the Lands Act [OCSLA], we hold that petitioner’s remedy is under the Lands Act and Louisiana law. The Lands Act makes it clear that federal law, supplemented by state law of the adjacent State, is to be applied to these artificial islands as though they were federal enclaves in an upland State. This approach was deliberately taken in lieu of treating the structures as vessels, to which admiralty law supplemented by the law of the jurisdiction of the vessel’s owner would apply.... Since the Seas Act does not apply of its own force under admiralty principles, and since the Lands Act deliberately eschewed the application of admiralty principles to these novel structures, Louisiana law is not ousted by the Seas Act, and under the Lands Act it is made applicable.
Id. at 1837. In a very comprehensive discussion of the legislative history of OCS-LA, the Supreme Court went on to make the following comments:
1. “Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, the legislative history shows that Congress did not intend that result. First, Congress assumed that the admiralty *506 law would not apply unless Congress made it apply, and then Congress decided not to make it apply. The legislative history of the Lands Act makes it clear that these structures were to be treated as island or as federal enclaves within a landlocked State, not as vessels.” Id. at 1840.
2. “Careful scrutiny of the hearings which were the basis for eliminating from the Lands Act the treatment of artificial islands as vessels convinces us that the motivation for this change, together with the adoption of state law as surrogate federal law, was the view that maritime law was inapposite to these fixed structures.” Id. at 1841.
3. “The committee was aware that it had the power to treat activity on these artificial islands as though it occurred aboard ship.... And the very decision to do so in the initial bill recognized that if it were not adopted explicitly, maritime simply would not apply to these stationary structures.... ” Id. at 1841 (citations omitted).
4. “[T]he special relationship between the men working on these artificial islands and the adjacent shore to which they commute to visit their families was also recognized by dropping the treatment of these structures as ‘vessels’ and instead, over the objection of the administration that these islands were not really located within a State, the bill was amended to treat them ‘as if (they) were (in) an area of exclusive Federal jurisdiction located within a State.’ ” Id. at 1842.
In light of the Supreme Court decision in Rodrigue and the absence of any later decision by the Supreme Court changing any of its conclusions in Rodrigue, I would submit that the following principles are applicable to the case now before us:
1. Structures placed on the Outer Continental Shelf “for the purpose of exploring for, developing, removing, and transmitting resources therefrom,” are not vessels;
2. Congress decided that maritime law does not apply to these structures; and
3. The laws of the State of Louisiana will apply to activities on these structures to the extent that such state laws are not inconsistent with other federal laws.

The First Statutory Amendment

In 1978, Congress adopted comprehensive amendments to OCSLA. See Pub.L. 95-372 (1978). Section 203(a) of this statutory amendment reads as follows:
SEC. 203. (a) Section 4(a)(1) of the Outer Continental Shelf Lands Act (43 U.S.C. 1833(a)(1)) is amended—
(1) by striking out “and fixed structures” and inserting in lieu thereof, and “all installations and other devices permanently or temporarily attached to the seabed,”; and
(2) by striking out “removing, and transporting resources therefrom” and inserting in lieu thereof “or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources.”
The report of the Conference Committee regarding the amendment reads as follows:
Section 203 — Laws Applicable to the Outer Continental Shelf
Both the Senate bill and the House amendment amend section 4(A)(1) of the OCS Act of 1953 by changing the term “fixed structures” to “and all installations and other devices permanently or temporarily attached to the seabed” and making other technical changes. The *507 Conference Report retains this language.
The intent of the managers in amending section 4(A) of the 1953 OCS Act is technical and perfecting and is meant to restate and clarify and not change existing law. Under the Conference Report language, federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production.
H.R. Conf. Rep. No. 95-1474 (1978). The House Committee Report No. 95-590 on this legislation states the following in the section-by-section analysis:
Section 203. — Laws Applicable to Outer Continental Shelf
Section (a) amends section 4(a)(1) of the OCS Act of 1953 by changing the term “fixed structures” to “and all installations and other devices permanently or temporarily attached to the seabed” and making other technical changes. It is thus made clear that Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production. The committee intends that Federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are connected to the seabed by drillstring, pipes, or other appurtenances, on the OCS for exploration, development, or production purposes. Ships and vessels are specifically not covered when they are being used for the purpose of transporting OCS mineral resources.
H.R.Rep. No. 95-590 (1978) (emphasis added).
I have found no Supreme Court decision and no Fifth Circuit decision which expressly discuss or interpret the significance of the statutory language change made by the 1978 Amendments to OCSLA regarding deletion of “fixed structures” and insertion of “all installations and other devices permanently or temporarily attached to the seabed” in the definition of the situs to which OCSLA is to apply. We must assume that when it was adopting the 1978 Amendments to OCSLA, Congress was aware of and considered the Supreme Court holding in Rodrigue. Since there is nothing in the text of the 1978 Amendments nor in any legislative history which would indicate a desire or intention on Congress’ part to change any of the Supreme Court’s holdings in Ro-drigue, we have to assume that Congress accepted those holdings as applicable to the 1978 Amendments. The deletion of the words “and fixed structures” and the insertion of the words “and all installations and other devices permanently or temporarily attached to the seabed” reflect a clear intention on the part of Congress to broaden and clarify the category of structures and facilities to which OCSLA would apply; and the House Committee Report 95-590 expressly identifies “drilling ships, semi-submersible drilling rigs, and other water craft, when they are connected to the seabed by drill string, pipes, or other appurtenances on the OCS for exploration development or production purposes” as being the situs of activities to which OCS-LA would apply. In my view, there is absolutely no question at all that these statutory language changes eliminate the basis for any distinction which our case law may have made in the past as between a “jack-up rig” being a vessel and “a fixed platform” not being a vessel, insofar as activities on the Outer Continental Shelf are concerned. Both our Circuit and the Supreme Court have clearly indicated that Congress holds the ultimate power in defining applicable law and categorizing the facilities and operations to which it applies *508 when dealing with activities on the Outer Continental Shelf.
The controlling premise of the majority-opinion in the case before us is that Fal-Rig 85 is a vessel.[3] Because it is a vessel, the majority says admiralty and maritime law controls its operations and activities. Because admiralty and maritime law applies, that body of law prevents and preempts any application of state law. If the majority’s original premise is incorrect, then their house of cards collapses.
In my view, we are bound by the Supreme Court decision in Rodrigue, and by Congress’ 1978 Amendments to OCSLA, to conclude that when a jack-up rig is operating on the Outer Continental Shelf, it cannot be construed as being a vessel because, in the statutory language, it is “an installation temporarily attached to the seabed for the purpose of exploring for, or producing oil and gas” or, in the language of the House Committee Report (supra), it is “a watercraft connected to the seabed by drillstring, pipes, or other appurtenances for exploration or production purposes.” This conclusion is mandated not only by the new language of OCSLA but also by common sense and plain language interpretation of “what is a vessel.”
The dictionary says that a vessel is “a craft for traveling on water.” Webster’s Collegiate Dictionary (Random House 1991). The quintessential characteristics of a vessel are that it floats on water and that it is used for transporting cargo or passengers from one place to another. In order to “float on water,” it must be supported by the laws of buoyancy, i.e., it will float to the extent that the volume of water which it displaces weighs more than the vessel and its cargo. However, the mere fact that a structure floats does not mean it is a vessel. A floating dock does float, but it is permanently connected to land and never goes anywhere. Likewise, a restaurant or gambling casino built on a barge is floating, but if it is connected to land by permanent mooring lines and utility lines (water, gas, sewage, electricity, telephones) and never moves, it is not a vessel; it is simply a floating dock with a restaurant on it, which earns money by selling food or games of chance, not by transporting cargo or people. A pontoon bridge floats, but it is not a vessel because it does not move once it is in place. Using these concepts to assess the characteristics of a jack-up drilling rig, I come to the easy conclusion that a jack-up drilling rig is clearly not a vessel when it is “jacked up.” Clearly, when it is jacked up, Fal-Rig 85 is not floating at all. The process of jacking up lifts the hull and work decks of the Fal-Rig 85 completely out of the water. The only parts of the Fal-Rig 85 which are in the water are its legs, which extend downward through the water into the seabed where support for the entire weight of Fal-Rig 85 is found in the sea bottom itself. In the jacked-up position, the hull and work decks of the Fal-Rig 85 are high enough out of the water that neither ocean currents nor wind generated wave action impacts the work area. Finally, in the jacked up position, the Fal-Rig 85 cannot move; its position in terms of longitude and latitude is fixed; it is stationary. The primary purpose for which the Fal-Rig 85 was built is to drill a hole in the earth under water in order to locate oil and/or gas and produce them if found. The Fal-Rig 85 earns its revenue for cutting the *509 hole and completing the well, and it performs these tasks only when it is jacked up. In its jacked up position, the Fal-Rig 85 is functionally indistinguishable from a drilling platform which has been assembled on site in the water: (1) both stand on legs resting on the bottom; (2) both have work decks and platforms high enough above the water to avoid currents and waves; and (3) both conduct drilling and completion activities for oil and gas production. I can see no rational basis for distinguishing the two platforms.
I recognize that our case law has labeled a jack-up drilling rig as a “special purpose vessel;” but in my view that is a mislabeling that confuses the realities involved and, in light of the 1978 Amendments to OCSLA, should not be applicable to operations on the Continental Shelf. The “special purpose” of a jack-up rig, which is drilling for oil and gas, has nothing to do with traditional maritime activities or interests. Drilling for oil and gas does not create any buoys, channel markers, or other aids to navigation. Drilling for oil and gas does not enhance or- improve the navigability of the waters in which it occurs. Drilling for oil and gas does not facilitate the loading or unloading of vessels. A jack-up drilling rig is a structure designed and constructed (1) to contain and house in one structure all of the work spaces, living spaces, machinery, and engines, pumps, generators, hoists, pipe racks, derrick, cranes, and other equipment required to conduct drilling operations into the earth and (2) to float in water when required to move from one drill site to another but then jack itself up out of the water to conduct drilling operations. This unique combination of functions saves time and expense by avoiding the dismantling and disassembly into pieces and units and the reassembling process which inevitably occurs in order to move a shore side drilling rig or a drilling platform which was originally constructed at a site in the water. While it is true that during the time a jack-up rig is being moved it floats and is moved by tug boats, like a barge, the percentage of time involved in such moves represents only a tiny fraction of the time that it is jacked up in a fixed position engaged in drilling operations. It is better labeled, therefore, as a “movable drilling platform” for it moves only for the purpose of drilling in another location and while drilling it is a fixed and stationary platform. To label the Fal-Rig 85 as a “vessel” when it has a casing being driven into the sea floor in anticipation of drilling with a drill stem for thousands of feet into the earth is simply nonsense to me.
In addition to the changes made by Congress in the definition of what constituted a “situs” for purposes of the Outer Continental Shelf Lands Act, the 1978 Amendments to OCSLA also made changes pertinent to our discussion here by (1) adding definitions for the term “exploration,” the term “development,” and the term “production” which had not previously been included in the 1953 Act; and by (2) deleting from old § 4(c) of the 1953 Act the phrase “described in subsection (b)” and inserting in lieu thereof “conducted on the Outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources ... of the sub-soil and seabed of the Outer Continental Shelf’ as it appeared in old subsection (b) of § 4 of the 1953 Act. While these amendments were more or less technical in nature, they clearly demonstrate that Congress considered changes needed in § 4(c) and wanted workman’s compensation benefits extended to employees who sustain disability or death on the broader definition of situs as contemplated by the amendments to § 4(a)(1) discussed earlier. In this regard, it should be noted that the original 1953 *510 Act contained a definition of the term “employee” which makes express that the term does not include “a master or member of a crew of any vessel” and this phraseology was retained in the 1978 amendments to the subsection dealing with the extension of compensation benefits.[4] Consequently, it seems clear to me that as of the time of the 1978 amendments to OCSLA, Congress intended that “employees” working on “all artificial islands and all installations and other devices permanently or temporarily attached to the seabed” would be entitled to receive compensation benefits in accordance with the provisions of LHWCA, but “crew members” of “any vessel” would not be entitled to receive compensation benefits. And this necessarily means that “artificial islands, etc.” and “vessels” are separate and distinct concepts, and we make a mistake when we fail to distinguish them. I have great difficulty, therefore, in understanding how the majority opinion concludes that the Fal-Rig 85 can be both at the same time.
Herb’s Welding — The Second Supreme Court Case
In resolving the interplay between the LHWCA and OCSLA, the decision of the U.S. Supreme Court in Herb’s Welding, Inc. v. Gray, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985), is the second case I view as controlling. Gray, a welder with Herb’s Welding, was employed to help repair and maintain oil and gas pipelines and fixed platform production structures in the Bay Marchand oil and gas field, which is located both in Louisiana territorial waters and in the Outer Continental Shelf. On July 11,1975, Gray was welding a two-inch gas pipeline on a platform in the navigable waters of Louisiana when an explosion occurred. Gray, in trying to run away from the area, twisted his knee. Gray received workman’s compensation benefits under the Louisiana compensation law, but the carrier refused to pay benefits under the LHWCA. An administrative law judge denied Gray’s claim for LHWCA benefits because he was “not involved in maritime employment.” The Benefits Review Board determined that Gray was covered under the LHWCA and remanded the case for entry of an award. The administrative law judge awarded $10,000 and deducted the $8,000 already awarded under the state compensation law. Herb’s Welding appealed the decision of the Benefits Review Board to a panel of the Fifth Circuit, which in April 1983, affirmed the decision of the Benefits Review Board by holding that Gray “was clearly employed in maritime employment and therefore was within the compensation coverage afforded by the LHWCA.” Herb’s Welding v. Gray, 703 F.2d 176, 180 (5th Cir.1983).
The Supreme Court granted certiorari and promptly reversed. In so doing, the Supreme Court held:
The rationale of the Court of Appeals was that offshore drilling is maritime *511 commerce and that anyone performing any task that is part and parcel of that activity is in maritime employment for LHWCA purposes. Since it is doubtful that an offshore driller will pay and maintain a worker on an offshore rig whose job is unnecessary to the venture, this approach would extend coverage to virtually everyone on the stationary platform. We think this construction of the Act is untenable.
Herb’s Welding, 105 S.Ct. at 1426. The Supreme Court went on to analyze its prior cases, particularly its decision in Rodrigue v. Aetna Casualty & Surety, supra, and to describe in some detail the factual circumstances that determine the nature of the employment that Gray was involved in:
[Gray] built and maintained pipelines and platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment, particularly since exploration and development of the Continental Shelf are not themselves maritime commerce.
Id. at 1428 (footnote omitted). In assessing the precedential aspects of the Supreme Court decision in Herb’s Welding, we need to remember that:
1. Gray’s injury occurred in 1975 at which time the pertinent statutory provisions were the LHWCA as amended in 1972 and OCSLA as originally passed in 1953;
2. Gray’s injury occurred on a fixed platform in Louisiana territorial waters;
3. The Supreme Court decision in Herb’s Welding was issued prior to the effective date of the 1984 amendments to LHWCA; and
4.The Supreme Court did not address in its decision the applicability of § 1333(b) of OCSLA, either in its form as it existed on the date of injury or as it was amended in 1978 during the course of appeals of Gray’s claim through the Benefits Review Board.[5]
Nevertheless, the Supreme Court decision in Herb’s Welding is especially controlling insofar as it deals with the meaning of the term “maritime employment.” The Court in Herb’s Welding discussed at great length the decision of the Supreme Court in Rodrigue, supra, and reconfirmed all of its essential holdings. In this regard, the Supreme Court in Herb’s Welding stated:
We cannot assume that Congress was unfamiliar with Rodrigue and the Lands Act when it referred to “maritime employment” in defining the term “employee” in 1972. It would have been a significant departure from prior understanding to use that phrase to reach stationary drilling rigs generally.
105 S.Ct. at 1427 (footnote omitted).
After categorizing the Fifth Circuit’s view of the term “maritime employment” as “expansive,” the Court went on to state:
The Amendments [1972 amendments to LHWCA] were not meant “to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity.” H.R. Rep. 92-1441, p. 11 (1972); S. Rep. 92-1125, p. 13 (1972); U.S. Code Cong. & Admin. News 1972, p. 4708. We have never read “maritime employment” to extend so far beyond those actually involved in moving cargo between ship and land transportation. Both Caputo and P.C. Pfeiffer Co. make *512 this clear and lead us to the conclusion that Gray was not engaged in maritime employment for purposes of the LHWCA.
Id. at 1427-28.
I have found no Supreme Court decision subsequent to Herb’s Welding that purports to overrule in whole or in part the principal core decision that the Supreme Court made in Herb’s Welding, i.e., that the term “maritime employment” does not include any of the various activities which lessees, operators, contractors, subcontractors, and their employees perform in connection with exploring for, drilling for, producing, and transporting oil and gas from the seabed beneath navigable waters.

198k Amendments to LHWCA

The second statutory amendment made by Congress which the panel majority did not consider in arriving at their conclusion is found in a portion of the 1984 amendments to the Longshoreman and Harbor Worker’s Compensation Act. These changes relate to the inclusion of new sub-paragraph (c) in 33 U.S.C. § 905 as it now exists. This change was initiated by a provision in Senate Bill 38 of the 98th Congress First Session set forth in § 4(c) of that bill, which reads as follows:
(c) Section 5 [of LHWCA] is amended by adding at the end thereof the following new subsection:
“(c) In the event that the negligence of a third party causes injury to a person entitled to receive benefits under this chapter by virtue of section 4 of the Outer Continental Shelf Lands Act (43 U.S.C. 1333), then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such third person in accordance with the provisions of section 38 of this Act. Nothing contained in this chapter, or in any otherwise applicable State law, shall preclude the enforcement according to is terms of any written agreement under which the employer has agreed to indemnify such third party in whole, or in part with respect to such action. ”
S. 38, 98th Cong. § 4(c) (1984) (emphasis added). The House of Representatives declined to go along with the changes contemplated by this section of the Senate Bill and the Conference Committee appointed to resolve this and other conflicts inserted the language as it now appears in 33 U.S.C. § 905(c) which reads as follows:
(c) Outer Continental Shelf
In the event that the negligence of a vessel causes injury to a person entitled to receive benefits under this chapter by virtue of section 1333 of Title 43, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel in accordance with the provisions of subsection (b) of this section. Nothing contained in subsection (b) of this section shall preclude the enforcement according to its terms of any reciprocal indemnity provision whereby the employer of a person entitled to receive benefits under this chapter by virtue of section 1333 of Title k3 and the vessel agree to defend and indemnify the other for cost of defense and loss or liability for damages arising out of or resulting from death or bodily injury to their employees.
33 U.S.C. § 905(c) (emphasis added).
The legislative history regarding this change indicates that the Senate Report stated:
Finally, the Senate Bill provides an exemption to the Longshore Act’s current proscription of indemnity agreements under Section 5(b) of the Act. That section is made applicable current *513 ly to situations on the Outer Continental Shelf by virtue of Section 4 of the Outer Continental Shelf Lands Act (43 U.S.C. 1333). The bill would legalize those indemnity agreements insofar as they apply to the Outer Continental Shelf and would further preempt the application of state laws prohibiting such indemnity agreements.
S.Rep. No. 98-81 (1983), reprinted in 1984 U.S.C.C.A.N. 2771, 2773 (emphasis added).
The report of the Conference Committee states:
Second, the substitute removes the current proscription with respect to mutual indemnity agreements between employers and vessels as applied to the Outer Continental Shelf by virtue of the Outer Continental Shelf Lands Act.
H.R. Conf. Rep. No. 98-1027 (1984), reprinted in 1984 U.S.C.C.A.N. 2771, 2774 (emphasis added).
In my view, it is extremely significant that, as indicated by the underlining in the text of the Senate Bill and the statute as finally passed, the word “third person” in the Senate Bill was changed to the word “vessel” in the statute as finally passed; the internal cross-reference as to the section under which “an action” may be brought was changed from “the provisions of section 33 of this Act” to “the provisions of subsection (b) of this section;” the opening phrase in the last sentence of the Senate Bill which stated “nothing contained in this chapter or in any otherwise applicable state law” was changed to read “nothing contained in subsection (b) of this section” in the statute as passed; and finally, the language at the end of the second sentence referring to “any written agreement under which the employer has agreed to indemnify such third party” was changed to refer to “any reciprocal indemnity provision whereby the employer of a person entitled to receive benefits under this chapter by virtue of section 1333 of Title 43 and the vessel agree to defend and indemnify the other.” From these textual changes and legislative history I draw the following conclusions fairly easily:
1. Senate Bill 38 intended to effect a preemption of “otherwise applicable state law,” but the final statute as passed says absolutely nothing about that subject;
2. The change from “third party” to “vessel” considerably narrows the category of parties (1) whose negligence may be the cause of injury to an oil field worker on the Outer Continental Shelf and (2) who would be entitled to be the beneficiary of an indemnity agreement from the employer; and
3. The term “vessel” as consciously inserted by Congress in § 905(c) must be construed consistently as that same term is used in OCSLA and, therefore, the term “vessel” cannot be taken to mean a situs of offshore oil and gas activity as defined in OCSLA.
The Third Supreme Court Case — Tallentire
The final Supreme Court case which I look to in assessing the issues in this case is the case of Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). In Tallentire, two offshore drilling platform workers were killed when the helicopter in which they were riding crashed in the high seas some 35 miles off the Louisiana coast while transporting them from the offshore drilling platform where they worked to their home base in Louisiana. The issue in the case revolved essentially around the provisions of § 7 of the Death on the High Seas Act (DOHSA) and the effect, if any, of OCSLA. Survivors of the deceased workers contended that they were entitled to damages based on the Louisiana Wrongful *514 Death Statute, which was made applicable either by its own terms or by the applicability of OCSLA. The federal district court determined that the survivors were entitled to benefits only under DOHSA. In a very long and scholarly opinion, a panel of our Court concluded that § 7 of DOHSA was broad enough on its face to permit the applicability of the Louisiana Wrongful Death Statute and that, as a matter of law, Louisiana has the authority to apply its Death Act to its own citizens on the high seas adjacent to its shores and that, therefore, the survivors may assert a claim under the Louisiana Death Act. Tallentire v. Offshore Logistics, Inc., 754 F.2d 1274 (5th Cir.1985). On the issue as to whether the Louisiana Wrongful Death Statute applied by way of § 1333 of OCS-LA, the Fifth Circuit panel waffled. It assumed that OCSLA does apply but the Louisiana statute would then be in conflict with DOHSA “so Louisiana law could be adopted only to the extent it is not inconsistent with DOHSA.”[6] Id. at 1279.
On appeal to the Supreme Court, the Supreme Court held “that neither OCSLA nor DOHSA requires or permits the application of Louisiana law in this case,” and accordingly the Court reversed and remanded the decision of the Fifth Circuit. As was the case in the Fifth Circuit opinion, the larger part of the Supreme Court decision related to the interpretation of § 7 of DOSHA, but the Court did address in clear and expressive language the interplay between DOHSA and OCSLA. See 106 S.Ct. at 2491-93. The Supreme Court determined that because the helicopter crash and ensuing death of the platform workers in this case occurred “miles away from the platform and on the high seas,” it would not be proper to extend OCSLA to the casualties in this case. In reviewing the history and applicability of OCSLA, the Supreme Court in Tallentire stated:
The intent behind OCSLA was to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State, and not as vessels, for purposes of defining the applicable law because maritime law was deemed inapposite to these fixed structures. See Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 361-366, 89 S.Ct. 1835, 1840-1842, 23 L.Ed.2d 360 (1969). This Court endorsed the congressional assumption that admiralty law generally would not apply to the lands and structures covered by OCSLA in Rodrigue, noting that accidents on the artificial islands covered by OCSLA “had no more connection with the ordinary stuff of admiralty than do accidents on piers.” Id. at 360, 89 S.Ct. at 1839-1840. See also Herb’s Welding, Inc. v. Gray, 470 U.S. 414, 422, 105 S.Ct. 1421, 1426, 84 L.Ed.2d 406 (1985). Thus, in Rodrigue, the Court held that an admiralty action under DOHSA does not apply to accidents “actually occurring” on these artificial islands, and that DOHSA therefore does not preclude the application of state law as adopted federal law through OCSLA to wrongful death actions arising from accidents on offshore platforms. Rodrigue v. Aetna Casualty Co., supra, 395 U.S. at 366, 89 S.Ct. at 1842.
Id. at 2491-92. While I recognize that the issue of what constitutes a “situs” as defined in OCSLA was not directly before the court in Tallentire, I think this quoted paragraph from Tallentire is very instruc *515 tive as indicating that as of 1986 the Supreme Court was clearly following the jurisprudential analysis of Rodrigue and Herb’s Welding as to whether the “artificial islands” involved in oil and gas production should be considered as “vessels” and that the place where an injury or death occurs is more determinative of the applicability of the Outer Continental Shelf Lands Act than the status of the injured worker as being employed in operations relating to production of oil and gas from the Outer Continental Shelf.

Undisputed Facts

At the time of his injury, Demette was employed by Frank’s Casing as a welder who welded together the segments of casing as they are installed in an oil and gas well. At the time of his injury, Demette was on the derrick floor of the Fal-Rig 85 and he was struck on the head by some object which fell from the derrick tower above him. At the time of Demette’s injury, the process of hammering the casing down into the sea floor was going on which means that the casing pipe extended from the derrick floor down into the seabed beneath the water. At the time of Dem-ette’s injury, Fal-Rig 85 was in a jacked-up position and was located on the Outer Continental Shelf adjacent to the State of Louisiana. A blanket service agreement was signed between Union Oil of California (Unocal) and Frank’s Casing Crew and Rental, Inc. (Frank’s), under the terms of which Frank’s was to provide casing installation services as specified in subsequent work orders. The blanket service agreement would cover work orders issued for casing services both onshore and offshore. Frank’s would be paid for its services by Unocal. Unocal also had a blanket service agreement with R&B Falcon Drilling USA, Inc. (Falcon). This contract provided Unocal with access to all of Falcon’s jack-up drilling rigs for offshore drilling, but it did not specify use of Fal-Rig 85. Each of the Unocal/Falcon and Unocal/Frank’s blanket agreements contains indemnity agreements, but there is no contractual agreement of any kind directly between Falcon and Frank’s.
Given these undisputed facts, I can easily concur with the majority holding that on the occasion of Demette’s injury, Fal-Rig 85 was a situs as defined in OCSLA because it was jacked up out of the water, supported by its legs resting on the sea bottom, and was connected to the sea bottom by the casing being driven into the floor of the ocean for the purpose of exploring for oil and gas. I, likewise, concur with the finding that the majority inferentially makes that at the time of his injury Demette was employed by an employer engaged in operations relating to exploration for and production of oil and gas from the Outer Continental Shelf and that, therefore, he would be entitled to compensation benefits for his injury from his employer under the provisions of § 1333(b) of OCSLA.
I have to abandon ship, however, from the rest of the majority’s conclusions. Specifically, I dissent from the following majority conclusions:
1. “Because maritime law applies of its own force, Louisiana law does not apply in this case.” Majority Opinion at 500.
2. “Thus all six factors [Davis case] point to the same conclusion: the contract and the injury that invoked it were maritime in nature.” Majority Opinion at 501. While the majority opinion does not specifically say, I have to assume that it is referring to the contract between Unocal and Frank’s because that is the only contract in which Frank’s agreed to indemnify anybody from anything; and
*516 3. Section 905(c) of LHWCA validates the indemnity agreement between Unocal and Frank’s, a conclusion which I find both unnecessary and incorrect.

Concluding Comments

In Rodrigue, the Supreme Court held that Congress made an explicit decision that maritime law would not apply to the “artificial islands placed or erected on the Outer Continental Shelf for the purpose of exploration, production, and development of oil and gas resources” when it passed the original OCSLA in 1953. After the Supreme Court decision in Rodrigue, Congress made substantial amendments to OCSLA in 1978, the most significant of which was the elimination of the term “fixed structures” and the insertion of the words “all installations and other devices permanently or temporarily attached to the seabed.” The legislative history of this change contains an express statement that: “The committee intends that federal law is, therefore, to be applicable to activities on drilling ships, semi-submersible drilling rigs, and other watercraft when they are connected to the seabed by drillstring, pipes, or other appurtenances.” H.R.Rep. No. 95-590. The key phrase in this new definition is “when they are connected to the seabed by drillstring, pipes, or other appurtenances” because these circumstances result in these “installations and other devices” being “permanently or temporarily attached to the seabed.” In this broader definition, Congress drew no distinctions as to whether the attachment was between the seabed and a fixed platform, a movable platform, a semi-submersible platform, or a drilling ship platform. I have to conclude, therefore, that from and after the 1978 Amendments to OCSLA all of our Circuit case law purporting to draw tortuous and complicated distinctions as to what is and is not a “vessel” are just “so much sound and fury signifying nothing” insofar as activities on the Outer Continental Shelf are concerned. Congress spoke originally in 1953, the Supreme Court interpreted in 1969, and Congress spoke again in 1978 without changing or correcting in any way the principles established by the Supreme Court that the artificial islands, structures, installations, and devices temporarily or permanently placed on the Outer Continental Shelf for the purpose of producing oil and gas are not “vessels” and that “maritime law” does not apply to them.
As to the conclusion that the contract between Unocal and Frank’s was maritime in nature, I think the panel majority’s conclusion is in direct conflict with the language of the Supreme Court in Herb’s Welding. The installation of casing at various stages in the drilling for and producing of an oil and gas well is normal and routine regardless of whether the oil well is producing from dry land on shore or from the seabed. The installation of casing in an oil and gas well has absolutely nothing to do with improving the navigability of the waters in which the well may be drilled, nor does it have anything to do with the placement of an aid to navigation in those waters, nor does it have anything to do with loading or unloading of a vessel. If, as the Supreme Court held in Herb’s Welding, a welder who repairs gathering pipelines and well production structures is not engaged in “maritime employment” because “there is nothing inherently maritime about those tasks,” then in my view the task of welding together segments of casing pipe as they are driven into the seabed, as Demette was doing here in this case, surely should not be deemed a maritime employment. Therefore, the contract between Unocal and Frank’s to provide such casing services should not be a maritime contract. Like a ship without an engine or rudder, our Fifth Circuit case law on the subject of “maritime employ *517 ment” and “maritime contracts” has floated from one side of the Gulf of Mexico to the other depending upon the vagaries of wind and current in each individual case. I regret to say that our Circuit case law on “what is a vessel” and “what is a maritime contract” and what is “maritime employment” have taken on a Humpty-Dumpty[7] approach — they are whatever a particular panel says they are. That’s a tragic circumstance because it destroys uniformity and predictability of the law; and the only ones who benefit from unpredictability and confusion are lawyers.
In regard to § 905(c) of LHWCA, I have great difficulty in understanding the rather convoluted argument which the majority opinion puts forth as to the applicability of this subsection. If the majority is correct that Fal-Rig 85 is a vessel whose special purpose was to drill an oil and gas well and Demette’s assignment of welding together segments of casing pipe was an essential aspect of that special purpose, then Demette was a member of the crew of a vessel and both § 1333(b) of OCSLA and § 902(3)(G) of LHWCA would exclude Demette from any right to compensation benefits under the LHWCA. Even if Demette were determined not to be a member of the crew of the Fal-Rig 85, he would not be entitled to benefits directly under LHWCA because Herb’s Welding specifically held that activities related to oil and gas production are not maritime employment. Likewise, if the majority opinion is correct that the Fal-Rig 85 is a vessel, then Demette would not be entitled to compensation benefits indirectly by way of § 1333(b) of OCSLA because the Fal-Rig 85 would not be a situs to which § 1333(b) could have extended those compensation benefits. In short, just as I believe that the Fal-Rig 85 cannot be a vessel and an OCSLA situs at the same time, I believe an injured employee cannot be an offshore oil production worker under § 1333(b) and a maritime worker under § 902(3) of the LHWCA at the same time. On the other hand, if I am correct that when it is jacked up and driving casing into the seabed, the Fal-Rig 85 is not a vessel but an OCSLA situs, then Demette is an oil field worker right where he should be on an OCSLA situs when he is injured and, therefore, is entitled to compensation benefits under § 1333(b). Of course, this discussion about compensation benefits is somewhat academic because Demette settled all of his personal injury claims and whether or not he received the compensation benefits he should have gotten is not an issue before us on appeal.
But the same conundrum arises in analyzing the applicability of § 905(c). A full understanding of the relevance of § 905(c) is much clearer when you look at the legislative history of that provision. As indicated earlier in this dissent, the first statutory iteration of the provisions which ultimately became § 905(c) was in Senate Bill 38 which used the term “third party” in place of the term “vessel” in identifying the negligent tortfeasor and in identifying the indemnitee of the indemnity agreement referred to therein.[8] Like *518 wise, Senate Bill 38 had an express provision contemplating that this new language would preempt and override “any otherwise applicable state law.” The House of Representatives was not agreeable to this change, and the Conference Committee eliminated the idea of preemption of state law altogether and inserted the word “vessel” in place of the words “third party.” It is uncontroverted that Demette’s injury occurred on the Fal-Rig 85, and there is nothing in the briefs or record excerpts to indicate that any other tug boat, crew boat, supply boat, barge, or other water craft was involved and could be the source of a “vessel negligence” claim. Therefore, if the Fal-Rig 85 in its jacked-up position is not a vessel (as I have argued earlier in this dissent), then there is no vessel negligence upon which Demette (the injured worker) could have sued and no vessel to be sued as defendant. If, on the other hand, the majority is right and the jacked-up Fal-Rig 85 is actually a vessel, then, because he is a member of the crew of the vessel, Dem-ette (the injured worker) loses his status as an employee entitled to compensation under § 1333(b), which is an essential condition to the applicability of § 905(c).

Conclusion

I recognize, of course, that no single panel of our Court can overrule any prior panel decisions and that the changes and reconsiderations that I suggest herein can only be effected by an en banc reconsideration by our Court. In my view, that is precisely what we should do, and I have written at length in this dissent in order to put the parties to this appeal, the amicus in this appeal, and other interested agencies on notice that I will call for a ballot for en banc reconsideration, if strong suggestions for such course of action from the parties and other interests are forthcoming. In my opinion, the seabed of the Outer Continental Shelf adjacent to the States of Texas, Louisiana, and Mississippi contains the largest volume of both discovered and undiscovered oil and gas resources of all of the areas of the Outer Continental Shelf. It is also my opinion that the largest number of workers involved in the development of these oil and gas resources on the Outer Continental Shelf come from the States of Texas, Louisiana, and Mississippi and that most of the operators, contractors, and subcontractors who engage in the business of drilling and producing oil and gas from the Outer Continental Shelf are either headquartered in or have major facilities in the States of Texas, Louisiana, and Mississippi. We are also blessed to have within the States of Texas, Louisiana, and Mississippi an enormous concentration of legal talent (private practitioners, corporate counsel, and law school professors) who are familiar with (1) the history of the development of the oil and gas resources on the Outer Continental Shelf, (2) the statutory enactments by Congress, (3) the Supreme Court decisions interpreting the statutes, (4) the statutes and interests of the adjacent states, and (5) that historic, traditional, judge-made body of amorphous law affectionately known as “admiralty and maritime law.” An en banc reconsideration of the enigmas raised here in this case, informed by briefs *519 of counsel for the parties and interested amici, would be a first step in bringing greater uniformity and predictability to the law applicable to the development of these increasingly critical natural resources.

. In 1953, there were no "jack-up rigs” operating in the area defined as the Outer Continental Shelf. The engineering and technological skills which produced the first "jack-up” rig were not developed until in the late 1950s and early 1960s. The use of the term "fixed structures” in the OCSLA was descriptive of the type of devices actually being used on the OCS; and therefore should probably not be read as restrictive to those structures only. In its traditional usage, the term "fixed structure” referred to a structure that's components were manufactured on shore, then floated out to a well site on barges, and then assembled and erected on site in the water.

. The phrases “general admiralty law” and "maritime law” do not appear anywhere in the OCSLA as originally passed in 1953; and these phrases were not inserted by the 1978 Amendments to OCSLA discussed later. Likewise, there is not now (and never has been) any language in the OCSLA which "requires courts to draw lines between the zones in which surrogate federal law applies and in which admiralty law applies” as the majority asserts in footnote 53 of the opinion. Therefore, there is no statutory basis for the majority’s holding (based on the second prong of PLT) that we must first determine whether admiralty and maritime law applies of their own accord before applying these choice-of-law provisions of the OCSLA.

. In footnote 18 of its opinion, the majority relies on Offshore Co. v. Robison, 266 F.2d 769 (5th Cir.1959), as being the original source of its premise; but the casualty in Robison occurred in the territorial waters of the State of Texas and there was no contention nor need for discussion as to the applicability of the OCSLA, which at that time referred to "artificial islands and fixed structures” in its definition of OCSLA situs.

. In footnote 19 of its opinion, the majority argues that the language excluding "master or number of crew of any vessel" from compensation benefits, indicates a contemplation on the part of Congress that "a vessel can be a OCSLA site” as otherwise this exclusion would be surplusage. But this same exclusionary language was in the original 1953 OCSLA when the definition of a situs was an "artificial island” or "fixed structure” neither of which would have been deemed a "vessel." I suggest that a better reading of this exclu-sionaiy language would be that Congress recognized in both the 1953 Act and the 1978 Amendments that there would be vessels (tugs and barges, crew boats, and tankers) transporting personnel and goods, supplies, consumables, and equipment to and from the "artificial islands” however defined; and that the crew members of such vessels would not be entitled to compensation even though they received an injury while actually on such "artificial islands.”

. On remand from the Supreme Court, the Fifth Circuit panel quickly concluded that Gray was not entitled to recover under § 1333(b) because of the “geographical limitation imposed by the OCSLA.’

. Curiously, the text of 43 U.S.C. § 1333 cited in footnote 7 of the Fifth Circuit opinion is the text of subsection (a)(1) as passed in 1953 even though the helicopter crash in Tallentire occurred in August 1980, well after the 1978 amendments to OCSLA which broadened the definition of a "situs” as discussed above.

. “There is glory for you,” [said Humpty-Dumpty]. “I don't know what you mean by 'glory,' ” Alice said. “I meant 'there is a nice knock-down argument for you,’ ” [said Humpty-Dumpty]. “But 'glory' doesn't mean a nice knock-down argument,” Alice objected. "When I use a word,” Humpty-Dumpty said in a rather scornful tone, "it means just what I choose it to mean, neither more nor less.” Lewis Carroll, Through the Looking Glass ch. 6.

. An earlier iteration of the amendment was proposed by the International Association of Drilling Contractors ("IADC”) during oversight hearings on the LHWCA in 1978. Oversight Hearings on the Longshoremen's and Harbor Workers' Compensation Act Before the House Subcommittee on Compensation, Health *518 and Safety, Committee on Education and Labor, 95th Cong. (May 3, 1978) (statement of Jon Bednerik, Director, Government Affairs, IADC). It is interesting to note that in this early version proposed by the IADC, the term "third party” is used instead of "vessel” and this version also makes no mention of state law preemption. Id. The IADC version also creates a definition for a "Marine Petroleum Worker” and makes the amendment only applicable to such workers. Id. This definition never made it into the proposed amendments of 1984.